# WATTS *v.* INDIANA.

No. 610.  Argued April 25, 1949.—Decided June 27, 1949.

*Franklin H. Williams* and *Thurgood Marshall* argued the cause for petitioner.  With them on the brief were *Robert L. Carter* and *Henry J. Richardson.*

*Frank E. Coughlin,* Deputy Attorney General of Indiana, argued the cause for respondent.  With him on the brief were *J. Emmett McManamon,* Attorney General, *Earl R. Cox* and *Merl M. Wall,* Deputy Attorneys General.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join.

Although the Constitution puts protection against crime predominantly in the keeping of the States, the

Fourteenth Amendment severely restricted the States in their administration of criminal justice. Thus, while the State courts have the responsibility for securing the rudimentary requirements of a civilized order, in discharging that responsibility there hangs over them the reviewing power of this Court.[1] Power of such delicacy and import must, of course, be exercised with the greatest forbearance. When, however, appeal is made to it, there is no escape. And so this Court once again must meet the uncongenial duty of testing the validity of a conviction by a State court for a State crime by what is to be found in the Due Process Clause of the Fourteenth Amendment. This case is here because the Supreme Court of Indiana rejected petitioner's claim that confessions elicited from him were procured under circumstances rendering their admission as evidence against him a denial of due process of law.[2] 226 Ind. 655, 82 N. E. 2d 846. The grounds on which our review was sought seemed sufficiently weighty to grant the petition for certiorari. 336 U. S. 917.

On review here of State convictions, all those matters which are usually termed issues of fact are for conclusive determination by the State courts and are not open for reconsideration by this Court. Observance of this re-

---

[1] Of course this Court does not have the corrective power over State courts that it has over the lower federal courts. See, e. g., *McNabb* v. *United States*, 318 U. S. 332. In the main, the proper administration of the criminal law of the States rests with the State courts. The nature of the Due Process Clause, however, potentially gives wide range to the reviewing power of this Court over State-court convictions.

[2] In the petitioner's statements there was acknowledgment of the possession of an incriminating gun, the existence of which the police independently established. But a coerced confession is inadmissible under the Due Process Clause even though statements in it may be independently established as true. See *Lisenba* v. *California*, 314 U. S. 219, 236–237.

striction in our review of State courts calls for the utmost scruple. But "issue of fact" is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication. *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 659, and cases cited. Especially in cases arising under the Due Process Clause is it important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits. See *Norris* v. *Alabama,* 294 U. S. 587, 589–90; *Marsh* v. *Alabama,* 326 U. S. 501, 510.

In the application of so embracing a constitutional concept as "due process," it would be idle to expect at all times unanimity of views. Nevertheless, in all the cases that have come here during the last decade from the courts of the various States in which it was claimed that the admission of coerced confessions vitiated convictions for murder,[3] there has been complete agreement that any

---

[3] The validity of a conviction because an allegedly coerced confession was used has been called into question in the following cases:

(A) Confession was found to be procured under circumstances violative of the Due Process Clause in *Haley* v. *Ohio,* 332 U. S. 596; *Malinski* v. *New York,* 324 U. S. 401; *Ashcraft* v. *Tennessee,* 322 U. S. 143; *Ward* v. *Texas,* 316 U. S. 547; *Lomax* v. *Texas,* 313 U. S. 544; *Vernon* v. *Alabama,* 313 U. S. 547; *White* v. *Texas,* 310 U. S. 530; *Canty* v. *Alabama,* 309 U. S. 629; *White* v. *Texas,* 309 U. S. 631; *Chambers* v. *Florida,* 309 U. S. 227; *Brown* v. *Mississippi,* 297 U. S. 278; and see *Ashcraft* v. *Tennessee,* 327 U. S. 274.

(B) Confession was found to have been procured under circumstances not violative of the Due Process Clause in *Lyons* v. *Oklahoma,* 322 U. S. 596, and *Lisenba* v. *California,* 314 U. S. 219.

conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved by the State's adjudication. Therefore only those elements of the events and circumstances in which a confession was involved that are unquestioned in the State's version of what happened are relevant to the constitutional issue here. But if force has been applied, this Court does not leave to local determination whether or not the confession was voluntary. There is torture of mind as well as body; the will is as much affected by fear as by force. And there comes a point where this Court should not be ignorant as judges of what we know as men. See Taft, C. J., in the *Child Labor Tax Case,* 259 U. S. 20, 37.

This brings us to the undisputed circumstances which must determine the issue of due process in this case. Thanks to the forthrightness of counsel for Indiana, these circumstances may be briefly stated.

On November 12, 1947, a Wednesday, petitioner was arrested and held as the suspected perpetrator of an alleged criminal assault earlier in the day. Later the same day, in the vicinity of this occurrence, a woman was found dead under conditions suggesting murder in the course of an attempted criminal assault. Suspicion of murder quickly turned towards petitioner and the police began to question him. They took him from the county jail to State Police Headquarters, where he was questioned by officers in relays from about 11:30 that night until sometime between 2:30 and 3 o'clock the following morning. The same procedure of persistent interrogation from about 5:30 in the afternoon until about 3 o'clock the following morning, by a relay of six to eight officers, was pursued on Thursday the 13th, Friday the 14th, Saturday the 15th, Monday the 17th. Sunday was a day of rest from interrogation. About 3 o'clock on Tuesday morning, November 18, the petitioner made an incriminating statement after continuous

questioning since 6 o'clock of the preceding evening. The statement did not satisfy the prosecutor who had been called in and he then took petitioner in hand. Petitioner, questioned by an interrogator of twenty years' experience as lawyer, judge and prosecutor, yielded a more incriminating document.

Until his inculpatory statements were secured, the petitioner was a prisoner in the exclusive control of the prosecuting authorities. He was kept for the first two days in solitary confinement in a cell aptly enough called "the hole" in view of its physical conditions as described by the State's witnesses. Apart from the five night sessions, the police intermittently interrogated Watts during the day and on three days drove him around town, hours at a time, with a view to eliciting identifications and other disclosures. Although the law of Indiana required that petitioner be given a prompt preliminary hearing before a magistrate, with all the protection a hearing was intended to give him, the petitioner was not only given no hearing during the entire period of interrogation but was without friendly or professional aid and without advice as to his constitutional rights. Disregard of rudimentary needs of life—opportunities for sleep and a decent allowance of food—are also relevant, not as aggravating elements of petitioner's treatment, but as part of the total situation out of which his confessions came and which stamped their character.

A confession by which life becomes forfeit must be the expression of free choice. A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would

54

have to shut our minds to the plain significance of what here transpired to deny that this was a calculated endeavor to secure a confession through the pressure of unrelenting interrogation. The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right. To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process.

This is so because it violates the underlying principle in our enforcement of the criminal law. Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. See Ploscowe, *The Development of Present-Day Criminal Procedures in Europe and America,* 48 Harv. L. Rev. 433, 457–58, 467–473 (1935). Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. "The law will not suffer a prisoner to be made the deluded instrument of his own conviction." 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed., 1824). The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights—these are all characteristics of the accusatorial system and manifestations of its demands.

Protracted, systematic and uncontrolled subjection of an accused to interrogation by the police for the purpose of eliciting disclosures or confessions is subversive of the accusatorial system. It is the inquisitorial system without its safeguards. For while under that system the accused is subjected to judicial interrogation, he is protected by the disinterestedness of the judge in the presence of counsel. See Keedy, *The Preliminary Investigation of Crime in France,* 88 U. of Pa. L. Rev. 692, 708–712 (1940).

In holding that the Due Process Clause bars police procedure which violates the basic notions of our accusatorial mode of prosecuting crime and vitiates a conviction based on the fruits of such procedure, we apply the Due Process Clause to its historic function of assuring appropriate procedure before liberty is curtailed or life is taken. We are deeply mindful of the anguishing problems which the incidence of crime presents to the States. But the history of the criminal law proves overwhelmingly that brutal methods of law enforcement are essentially self-defeating, whatever may be their effect in a particular case. See, *e. g.,* Radzinowicz, A History of English Criminal Law and its Administration from 1750, *passim* (1948). Law triumphs when the natural impulses aroused by a shocking crime yield to the safeguards which our civilization has evolved for an administration of criminal justice at once rational and effective.

We have examined petitioner's other contentions and do not sustain them.

*Reversed.*

MR. JUSTICE BLACK concurs in the judgment of the Court on the authority of *Chambers* v. *Florida,* 309 U. S. 227; *Ashcraft* v. *Tennessee,* 322 U. S. 143.

On the record before us and in view of the consideration given to the evidence by the state courts and the conclu-

sion reached, THE CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE BURTON believe that the judgment should be affirmed.

MR. JUSTICE DOUGLAS, concurring.

The following are the undisputed facts:

Petitioner was taken into custody early in the afternoon on Wednesday, November 12, 1947. He was first detained on suspicion of having committed a criminal assault, and it was not until later in the day of his arrest that he was suspected of having committed the murder for which he was later tried and convicted. He was held without being arraigned, until the following Tuesday when he gave a confession that satisfied the police. At no time was he advised of his right to remain silent, nor did he have the advice of family, friends or counsel during his confinement. He was not promptly arraigned as Indiana law requires.

During this confinement, petitioner was held in the county jail. The first two days he was placed in solitary confinement in a cell known among the prisoners as "the hole." There was no place on which to sit or sleep except the floor. Throughout this six-day confinement petitioner was subjected each day, except Sunday, to long periods of interrogation. He was moved to the State Police Headquarters for these questionings. The question period would usually begin about six o'clock in the evening, except for the first night when it began about eleven thirty. Each question period would extend to two or three o'clock the following morning. These interrogations were conducted by relays of small groups of officers. On several occasions petitioner was given lie detector tests. Following the evening's interrogation, he would be returned to the county jail. Even then he was not always given respite until the next evening's ordeal commenced. He was subjected to intermittent

questioning during the day, and on three afternoons he was driven about the town for several hours by the police in an attempt to elicit further information and to reconstruct petitioner's activities the day of the crime.

It was about two or three o'clock Tuesday morning after about seven hours' interrogation that petitioner gave the confession used against him over objection at his trial. This was after six days of confinement.

It would be naive to think that this protective custody was less than the inquisition. The man was held until he broke. Then and only then was he arraigned and given the protection which the law provides all accused. Detention without arraignment is a time-honored method for keeping an accused under the exclusive control of the police. They can then operate at their leisure. The accused is wholly at their mercy. He is without the aid of counsel or friends; and he is denied the protection of the magistrate. We should unequivocally condemn the procedure and stand ready to outlaw, as we did in *Malinski* v. *New York,* 324 U. S. 401, and *Haley* v. *Ohio,* 332 U. S. 596, any confession obtained during the period of the unlawful detention. The procedure breeds coerced confessions. It is the root of the evil. It is the procedure without which the inquisition could not flourish in the country.

MR. JUSTICE JACKSON concurring in the result in No. 610 and dissenting in Nos. 76 and 107.*

These three cases, from widely separated states, present essentially the same problem. Its recurrence suggests that it has roots in some condition fundamental and general to our criminal system.

---

*[For other opinions in No. 76, *Harris* v. *South Carolina,* and No. 107, *Turner* v. *Pennsylvania,* see *post,* pp. 68, 62.]

In each case police were confronted with one or more brutal murders which the authorities were under the highest duty to solve. Each of these murders was un-witnessed, and the only positive knowledge on which a solution could be based was possessed by the killer. In each there was reasonable ground to *suspect* an individual but not enough legal evidence to *charge* him with guilt. In each the police attempted to meet the situation by taking the suspect into custody and interrogating him. This extended over varying periods. In each, confes-sions were made and received in evidence at the trial. Checked with external evidence, they are inherently be-lievable, and were not shaken as to truth by anything that occurred at the trial. Each confessor was convicted by a jury and state courts affirmed. This Court sets all three convictions aside.

The seriousness of the Court's judgment is that no one suggests that any course held promise of solution of these murders other than to take the suspect into custody for questioning. The alternative was to close the books on the crime and forget it, with the suspect at large. This is a grave choice for a society in which two-thirds of the murders already are closed out as insoluble.

A concurring opinion, however, goes to the very limit and seems to declare for outlawing any confession, how-ever freely given, if obtained during a period of custody between arrest and arraignment—which, in practice, means all of them.

Others would strike down these confessions because of conditions which they say make them "involuntary." In this, on only a printed record, they pit their judgment against that of the trial judge and the jury. Both, with the great advantage of hearing and seeing the confessor and also the officers whose conduct and bearing toward him is in question, have found that the confessions were voluntary. In addition, the majority overrule in each

case one or more state appellate courts, which have the same limited opportunity to know the truth that we do.

Amid much that is irrelevant or trivial, one serious situation seems to me to stand out in these cases. The suspect neither had nor was advised of his right to get counsel. This presents a real dilemma in a free society. To subject one without counsel to questioning which may and is intended to convict him, is a real peril to individual freedom. To bring in a lawyer means a real peril to solution of the crime, because, under our adversary system, he deems that his sole duty is to protect his client—guilty or innocent—and that in such a capacity he owes no duty whatever to help society solve its crime problem. Under this conception of criminal procedure, any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.

If the State may arrest on suspicion and interrogate without counsel, there is no denying the fact that it largely negates the benefits of the constitutional guaranty of the right to assistance of counsel. Any lawyer who has ever been called into a case after his client has "told all" and turned any evidence he has over to the Government, knows how helpless he is to protect his client against the facts thus disclosed.

I suppose the view one takes will turn on what one thinks should be the right of an accused person against the State. Is it his right to have the judgment on the facts? Or is it his right to have a judgment based on only such evidence as he cannot conceal from the authorities, who cannot compel him to testify in court and also cannot question him before? Our system comes close to the latter by any interpretation, for the defendant is shielded by such safeguards as no system of law except the Anglo-American concedes to him.

Of course, no confession that has been obtained by any form of physical violence to the person is reliable and

hence no conviction should rest upon one obtained in that manner. Such treatment not only breaks the will to conceal or lie, but may even break the will to stand by the truth. Nor is it questioned that the same result can sometimes be achieved by threats, promises, or inducements, which torture the mind but put no scar on the body. If the opinion of MR. JUSTICE FRANKFURTER in the *Watts* case were based solely on the State's admissions as to the treatment of Watts, I should not disagree. But if ultimate quest in a criminal trial is the truth and if the circumstances indicate no violence or threats of it, should society be deprived of the suspect's help in solving a crime merely because he was confined and questioned when uncounseled?

We must not overlook that, in these as in some previous cases, once a confession is obtained it supplies ways of verifying its trustworthiness. In these cases before us the verification is sufficient to leave me in no doubt that the admissions of guilt were genuine and truthful. Such corroboration consists in one case of finding a weapon where the accused has said he hid it, and in others that conditions which could only have been known to one who was implicated correspond with his story. It is possible, but it is rare, that a confession, if repudiated on the trial, standing alone will convict unless there is external proof of its verity.

In all such cases, along with other conditions criticized, the continuity and duration of the questioning is invoked and it is called an "inquiry," "inquest" or "inquisition," depending mainly on the emotional state of the writer. But as in some of the cases here, if interrogation is permissible at all, there are sound reasons for prolonging it—which the opinions here ignore. The suspect at first perhaps makes an effort to exculpate himself by alibis or other statements. These are verified, found false, and he is then confronted with his falsehood. Sometimes

(though such cases do not reach us) verification proves them true or credible and the suspect is released. Sometimes, as here, more than one crime is involved. The duration of an interrogation may well depend on the temperament, shrewdness and cunning of the accused and the competence of the examiner. But, assuming a right to examine at all, the right must include what is made reasonably necessary by the facts of the particular case.

If the right of interrogation be admitted, then it seems to me that we must leave it to trial judges and juries and state appellate courts to decide individual cases, unless they show some want of proper standards of decision. I find nothing to indicate that any of the courts below in these cases did not have a correct understanding of the Fourteenth Amendment, unless this Court thinks it means absolute prohibition of interrogation while in custody before arraignment.

I suppose no one would doubt that our Constitution and Bill of Rights, grounded in revolt against the arbitrary measures of George III and in the philosophy of the French Revolution, represent the maximum restrictions upon the power of organized society over the individual that are compatible with the maintenance of organized society itself. They were so intended and should be so interpreted. It cannot be denied that, even if construed as these provisions traditionally have been, they contain an aggregate of restrictions which seriously limit the power of society to solve such crimes as confront us in these cases. Those restrictions we should not for that reason cast aside, but that is good reason for indulging in no unnecessary expansion of them.

I doubt very much if they require us to hold that the State may not take into custody and question one suspected reasonably of an unwitnessed murder. If it does, the people of this country must discipline themselves to seeing their police stand by helplessly while those sus-

pected of murder prowl about unmolested. Is it a necessary price to pay for the fairness which we know as "due process of law"? And if not a necessary one, should it be demanded by this Court? I do not know the ultimate answer to these questions; but, for the present, I should not increase the handicap on society.