CARIGNAN v. UNITED STATES.

No. 12517.

United States Court of Appeals
Ninth Circuit.

Dec. 8, 1950.

Harold J. Butcher, Anchorage, Alaska, for appellant.

J. Earl Cooper, U. S. Atty., Anchorage, Alaska, for appellee.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

Appellant was indicted and convicted of murdering one Laura Showalter in the course of an attempt to commit rape upon her. As required by the pertinent Alaska statute,[1] he was sentenced to death.

Numerous grounds for reversal are assigned, four of which, only, are urged. These are (1) that there was error in admitting a confession of appellant, claimed to have been involuntary and wrongfully procured; (2) that the court erred in declining to permit the accused to take the stand and testify, in the absence of the jury, on matters concerning the admissibility of the confession; (3) that the court was in error in denying the accused's motion for removal of the cause on the ground of the existence of local passion and prejudice rendering a fair trial impossible; and (4) that the verdict is not supported by the evidence in that there was no proof that the homicide occurred in the course of an attempted rape.

Following is a summary of the development of the case as shown by witnesses for the government. About nine o'clock on the evening of July 31, 1949, one Keith, while walking toward his home in the city of Anchorage, observed a man and woman lying in the grass in a small park. He stepped over toward them, whereupon the man raised up and told him to move on. About six o'clock the following morning, while on his way downtown, Keith examined the area where the incident of the previous evening had occurred, and discovered a dead woman in a semi-nude condition lying in the grass. He at once reported the matter to the police.

On September 14 following, in Anchorage, an unknown person assaulted and attempted to rape one Christine Norton. A similarity in the circumstances suggested the likelihood that this and the earlier crime had been committed by the same person. On Friday, September 16, appellant (who will hereafter be referred to as Carignan) was brought to the police station and placed in a lineup with several other suspects, and the Norton woman identified him as her assailant. On that day the witness Keith, also, was summoned by the police and at least tentatively identified Carignan in a lineup as the man he had seen lying with the woman in the park. Carignan was at once arrested on the charge of assault to rape Christine Norton, was taken before a magistrate, advised of his rights, and apparently given a preliminary hearing on the charge. Thereafter, being held to answer, he remained in custody in the city jail. No complaint was lodged against him in respect of the Showalter murder, and he was at no time taken before a magistrate for examination or commitment on that charge. The police questioned him, however, in an endeavor to obtain a statement implicating him in the death of Mrs. Showalter.

Being unable to get any information from him, the police, on Saturday morning, Sep-

1. Section 65-4-1, Alaska Compiled Laws Annotated, 1949.

tember 17, took him to the office of United States Marshal Herring. We here summarize the latter's testimony in respect of his inquisition, as given before the jury. Herring questioned Carignan about the occurrence of July 31, and the latter asked to see a priest. After about an hour's conference with the priest Carignan was again asked whether he cared to make a statement and replied that he did. The Marshal gave him a pad of paper and some pencils, and he was placed alone in a cell in the city jail where he was left to himself over Sunday, the Marshal merely calling on him that day to see how he was getting along. On Monday morning he was again brought to the office of the Marshal where the latter asked him if he had prepared a statement. He replied that he had but would like to see the priest again before turning it over. The priest was called and remained with Carignan about an hour.

Afterwards Carignan handed the Marshal the writing he had prepared, but this writing covered only the events of the day and early evening of July 31st, pertaining for the most part to a prolonged drinking bout in which Carignan had engaged with some companions. It made no mention of the subject in which the Marshal was interested. Carignan said he was afraid to say more for fear that he wouldn't be believed and for fear that "his neck would stretch." After further conversation between the two he was prevailed upon to continue the narrative, and he accordingly added an account of his being with and having violently beaten with his fists the woman in the park. When he handed the completed statement to the Marshal he was told by the latter that he could still destroy it if he wished. Altogether, the whole or the major portions of the

Saturday and Monday were consumed in the interchanges described.

Carignan appears to have received kindly treatment throughout the period so far as concerned his bodily needs. Herring testified that he made no promises in the course of his efforts to extract the confession. He did, however, tell Carignan that there had been no hangings in the Anchorage judicial division in 27 years. There was also some conversation between the two about conditions at McNeil Island and the Marshal informed Carignan of the facilities afforded the inmates there of learning a trade. In the course of the several interviews the Marshal told Carignan of his own unhappy childhood in an orphan's home and likened his early experience with that of Carignan, who had been for a long time a juvenile inmate of an industrial school in the States. It appears, further that the Marshal had on the walls of his office a number of religious pictures, of saints and the like, including one of Jesus. These are said to have been collections made by the officer from the old Orthodox churches of the days of the Russian occupation. The Marshal showed them to Carignan, asked him to look into the eyes of the pictured Christ, and in effect suggested to him the advisability of his setting himself right with his Maker by confessing the truth concerning his misdoing.

At the trial the confession was received over objection of counsel appointed by the court to conduct Carignan's defense. Counsel here contends that it was inadmissible under the standards set in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819, and subsequent decisions relating to the admissibility of confessions. He further complains of a violation of Rule 5 (a) and (b) of the Federal Rules of Criminal Procedure,[2] and contends that the fail-

---

2. "(a) Appearance before the Commissioner. An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States.

When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith.

"(b) Statement by the Commissioner. The Commissioner shall inform the defendant of the complaint against him, of his right to retain counsel and of his right to have a preliminary examination. He shall also inform the defendant that

ure to comply with the rule rendered the confession inadmissible.

Government counsel insists that the rule has no application to the circumstances of the case. He points to the concession of the appellant that upon the latter's arrest in the Norton matter he was at once taken before a magistrate and was advised of the nature of the charge against him, of his right to counsel, and kindred rights. He argues that Carignan was at no time during the period in question under any restraint concerning the death of Mrs. Showalter, that he was not arrested or being held in connection with the murder, hence there was no necessity for following the procedure prescribed by the Rule. It is urged that since the crime of assault with intent to commit rape is a bailable offense, the accused upon being committed was free to go at any time he might furnish bail.

The decisions teach that cases of this type do not yield to uniform treatment, but that each is to be considered in its own setting and in light of its peculiar circumstances. The mere fact that a confession was made by a person while in the custody of the police does not render it inadmissible. And we assume also, however debatable the point, that where an individual is simultaneously suspected of two crimes and has been arrested and regularly taken before a magistrate and committed in respect of one of them, he is not, while so confined, necessarily immune from questioning on the other absent a repetition of the procedure outlined by the Rule.[3] The basic question we take to be whether, considering all circumstances, the historic safeguards that a civilized society accords the individual were here substantially satisfied. On these preliminary assumptions we turn again to the facts.

Appellant was 22 years of age at the time of his trial. He had been inducted into the Army direct from the juvenile detention school where he appears to have spent most of his boyhood, and had ultimately wound up at a military post near Anchorage where he was serving at the time of his arrest. He had no lawyer. Presumably he had not felt the need of one on the occasion of his being taken before the magistrate on the assault charge. But when the Marshal took him in hand he was confronted with a situation of a totally different color. He faced then a posture of affairs in which life itself was at stake, and the need of safeguards, more especially of legal counsel, was correspondingly great.

It is plain from a study of the record that the Marshal succeeded to an extraordinary degree in winning the confidence and influencing the conduct of this wretched boy. The ascendancy of the officer was such that he was entitled to take nothing for granted. Having established himself as it were in the role of father confessor, he was obliged to be punctilious in discharging his earthly duty as an officer of the law. We think as judged by standards now prevailing, he failed in the latter respect. The Marshal says that when Carignan was first brought to his office he "warned him of his rights." The following excerpt from the record indicates the faintness of the warning in light of what was thereafter to ensue:

"Q. In what manner did you warn him of his rights? What did you tell him? A. I told him he did not have to make a statement at this time, that anything he said could be used against him, and that he was entitled to counsel if he so desired.

"Q. Did he discuss with you the question of getting counsel at that time? A. No, sir, he did not.

"Q. Did you ever discuss with him the question of getting counsel? A. No, sir."

Considering all the circumstances, including the youth and inexperience of the subject, we think this was not enough. The occasion ultimately arose in the course of this suction process when the need for more became painfully obvious. We refer to

---

he is not required to make a statement and that any statement made by him may be used against him. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail

as provided in these rules." Rule 5, 18 U.S.C.A.

**3.** Compare McNabb case on its second trial, McNabb v. United States, 6 Cir., 142 F.2d 904.

the Monday when Carignan handed to the Marshal his innocuous writing and expressed the fear that if he said more "his neck would stretch." Humanly speaking, what the occasion called for was the suggestion that it would be well for the young man to call in a lawyer and obtain advice before taking any irrevocable step. No suggestion of the sort was forthcoming. Instead, apparently, the suspect's inquisitor told him that "in the time I had been in this division for 27 years there had been no hangings." Nobody knew better than the Marshal that if Carignan were to consult a lawyer at that juncture he would infallibly be advised to keep his mouth shut and make no statement of any kind. Thus the purpose of the officer forbade even the mention of the subject of counsel, whereas a duly constituted magistrate with no inquisitorial axe to grind, mindful of the youth and inexperience of the subject and the extreme gravity of the charge, could be expected to perform his functions fully and fairly. Moreover the opportunity to read, or hear read, a formal complaint charging murder in an attempt to rape would put the accused on notice that hanging was mandatory in the event of a verdict of guilty.

What the court has to decide is whether the circumstances outlined were such as to bring the case within the spirit and intent of Rule 5 and the holding of the McNabb decision, supra, as further expounded in Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100.[4]

It can not fairly be said that the confession here obtained did not involve "use by the Government of the fruits of wrongdoing by its officers." Upshaw v. United States, supra, 335 U.S. at pages 413, 414, 69 S.Ct. at page 172. It was not impracticable to arraign Carignan before a magistrate on the murder charge of which he was more than suspected, and there was abundant time and opportunity to do that. Nor, keeping in mind the totality of the circumstances, can one say that such procedure, plus the filing of the formal complaint made

mandatory by the rule, would have proved a mere idle ceremony. Significantly, Mr. Justice Reed, who was the sole dissenter in the McNabb case, and who along with three other Justices dissented in Upshaw v. United States, commented in the latter dissent, 335 U.S. at page 424, 69 S.Ct. at page 177, on the special advantage to the inexperienced of such a hearing, saying: "It must be admitted that a prompt hearing gives an accused an opportunity to obtain a lawyer; to secure from him advice as to maintaining an absolute silence to all questions, no matter how apparently innocuous; * * * and that these privileges are more valuable to the illiterate and inexperienced than to the educated and well-briefed accused."

We hold, therefore, that the court was in error in admitting the confession and the oral statements of the accused which came as its aftermath. It is clear that without it there might well have been no conviction or that the verdict might have been of murder in a lesser degree.

Since a new trial may be ordered in the discretion of the court it will be well to notice briefly the remaining points argued. The granting or denial of the motion for removal of the cause was a matter within the judgment and discretion of the court and we can not say that the discretion was abused. There was sufficient evidence to support a finding that Mrs. Showalter was murdered in the course of an attempt to rape her. As for the remaining point urged there is no occasion now to rule upon it.

The judgment is reversed and the cause remanded for further proceedings.

BONE, Circuit Judge (concurring in result).

Despite my personal conviction that simple justice in this case would be served by affirmance of the judgment, I feel obliged, for reasons noted below, to agree with the final holding announced by Judge Healy in which the judgment is reversed.

The prevailing opinion outlines the general fact situation revealed by the record

4. In the view of the writer of this opinion something approaching psychological pressure, not unmixed with deceit, contributed to the extraction of the confession. Since the majority are of a contrary opinion this possible aspect has not been given weight in the decision to reverse.

and most of these matters require no further comment. Unless I wholly misunderstand the import and teachings of the Upshaw decision, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, application of the rule it announces requires our disposition of this case on this appeal. Before proceeding to a discussion of the Upshaw case certain vital aspects of the instant case deserve emphasis.

As our opinion points out appellant was questioned about his rape of Christine Norton after being picked up on that charge. While being questioned regarding that offense (upon which he was later convicted) appellant was incidentally questioned about the Showalter murder then under investigation but he gave the officers no information about the Showalter matter. It is obvious that up to this time he had said nothing which was, or could be, used against him. A short time later, and in the office of the United States Marshal, occurred the questioning regarding Laura Showalter with which we are here concerned. As respects this questioning, Judge Healy makes plain that at all times when it was under way the officers concerned treated appellant in a restrained and kindly way. In this posture of the facts I think the confession he made to the Marshal escapes the taint of a *constitutional* infirmity.

I think that sound reasons underlie the foregoing conclusion. While I am in agreement with our final disposition of the case, I cannot concede that the record justifies the conclusion (or even a strong inference) that the confession was made because appellant was badgered, overreached, coerced or intimidated to a point where a confession was literally wrung from him by unfair methods. I consider his confession to be the product of free will—as much cold and deliberate free will as the impulse that sent him on the pathway of vicious criminality revealed by this sordid record. In my view this man knew at each stage of all the proceedings here involved, exactly what he was doing, and why.

The record shows that at or about the time he was previously questioned concerning the Norton rape he was then fully advised as to *all* of his legal rights in connection with an inquiry concerning his connection with a crime. It would literally rape Reason and stand Logic on her head to assume that with this explicit advice as to all of his rights in such a matter still ringing in his ears, appellant failed to understand, fully and completely, that these same rights were his freely to invoke when almost immediately afterward he was questioned by the United States Marshal in a similar inquiry concerning a much more serious offense—his possible connection with the murder of Laura Showalter. I think that the Marshal's statement to him served to again emphasize his right to remain silent if he chose so to do.

We would be utterly naive if we overlooked the cold, hard fact that we are not here dealing with a simple childlike mentality. We deal with a cold-blooded rapist who was clever and cunning enough to hide his criminal trail with great skill. He did not require the services of an attorney to know that he did not have to "talk"—the record shows that he was advised at the Norton inquiry and fully understood that he could remain silent from the moment of his apprehension and detention on a criminal charge to the very end of the legal trail. His age and the extent of his literacy justifies the most careful appraisal of his understanding of the issues confronting him in the later Showalter matter. It will not do to rake and scrape through the whole gamut of possibilities to find some plausible reason to believe that he was a dull clod rather than a pretty smart criminal. That he did not know at all pertinent times that he could remain silent as to Laura Showalter is a conclusion wholly unjustified by the record.

There is in this case another impressive fact which lends imposing strength to the view that the confession made to the Marshal was purely and wholly voluntary. Appellant was obviously deeply moved at that time by some form of remorse which induced him to demand the advice of a priest. Perhaps he felt an impulse to change his mind about silence and wanted to discuss this matter with a churchman before reaching a final decision regarding a confession. How can any court or any judge weigh such a consideration with the

slightest hope of reaching a just or logical conclusion? It is certain that we should not substitute judicial guesses for what this spiritual adviser may have urged appellant to do. If appellant was urged by the priest to make a clean breast of the whole affair (if he was actually guilty) this contemplation goes to the very heart of the problem of the voluntary or involuntary nature of the confession made after the conferences. That this aspect of the matter was being weighed by appellant is given further emphasis by the fact that the priest came back a second time at the request of appellant.

If, as a final result of the two conferences with the priest there arose in appellant's mind a pervading and overwhelming sense of guilt over having brutally murdered an aged and inoffensive woman, we are justified in the assumption that the resulting confession was probably the product of this sense of guilt. No one will contend that a detainee was not entitled to have (and to act upon) the *advice* of a man of the church—if this is a *right*, how is any court to determine with any hope of accuracy that the prisoner did not elect to act on the advice that was given?[1] It is of the utmost significance that the confession came shortly after the visits of the priest, a circumstance not to be casually brushed aside. The timing of the confession is a factor which convinces me that the two conferences were infinitely more persuasive in inducing appellant to "tell the truth" than merely gazing at religious pictures and hearing the Marshal tell him that he ought to tell the truth. I am unwilling to casually set aside all consideration of the possible and probable effect of the priestly visits as a matter of no consequence, and furthermore, I am unwilling to agree that it violated the rights of appellant for the Marshal to urge him to "tell the truth."

It seems too clear for argument that under any conceivable theory of American law appellant had an *absolute* right to make a *voluntary* confession at *any time*. Surely it will not be seriously argued that courts may, by some judicial ipse dixit, *deny* to any person detained by officials for questioning, this absolute right voluntarily to confess to the commission of a crime regardless of whether the confession comes before or after arraignment. (In this case appellant was not arraigned.) Nor can it be said that denial of a right *voluntarily* to confess *at any time* may be spelled out of any proper, or even strained, construction of Rule 5(a) (b) of the Rules of Crim. Proc. 18 U.S.C.A.

## The Upshaw Doctrine

But regardless of what has been said before it seems clear that the issue we face may not be disposed of on the basis of the voluntary or involuntary character of the confession. Judge Healy's opinion permits the assumption that even though the confession was absolutely voluntary, nonetheless, under (required) strict application of the rule announced in Upshaw, the failure of the officers to have Carignan arraigned within the period indicated in Rule 5(a) (b) *before quizzing him in any manner* about his possible connection with the murder of Laura Showalter, *automatically* requires reversal of the judgment of conviction. Because under the facts of this case I fear that this reversal will bring about a grave miscarriage of justice, I have indicated my view about the nature of the confession.

As I read the Upshaw decision it seems clear that (as applied to the facts of this case) admissibility of appellant's confession turns upon its *timing* and not upon either its truth or voluntary character, or, upon *both* truth *and* voluntary character. In such a case it is apparent that even if the confession was as true as Holy Writ and absolutely free from the taint of any form of coercion, it must be rejected as evidence because it was secured (or accepted) *prior to arraignment*. This being my understanding of the rule of evidence laid down in Upshaw I feel obliged to agree with Judge Healy in reversing the judgment.

Before commenting further on the Upshaw doctrine I emphasize the fact that in this case we face a situation where, in try-

---

1. I presume that courts will not challenge the legal right of a churchman to offer advice which might induce a confession.

ing to locate and apprehend a rape fiend and promptly end his murderous career which was terrorizing an entire community and brutally depriving innocent and law-abiding people of *their* legal and constitutional rights by his criminal assaults, the local officers involved were discharging the highest legal and moral duty to protect decent citizens who had hired them for that very purpose. These citizens had every legal right to demand complete fidelity to that duty on the part of their public servants, a fact which is brought home to police officers with unstinted vigor when the lives and safety of citizens are at stake. Considering the great urgency of the situation where prompt action was vitally necessary and delay in capturing appellant and bringing about the end of his criminal activities might surely mean other murders, I think that the officers here concerned discharged their duty to the public with admirable restraint and with a full sense of their obligations to society. I refuse to chalk up to their discredit their very sensible recognition of the fact that *the law abiding also have rights* which the law must protect if it hopes to retain the respect and confidence of decent people—the kind of people upon whose moral and civic standards the nation must rely if it is to endure.

In laying the teachings of the Upshaw decision alongside the facts before us, and in appraising its ultimate holding, I feel justified in accepting the conclusions as to its exact meaning which were expressed by Mr. Justice Reed who spoke for four dissenting members of the Court. I quote pertinent statements in the dissenting opinion: "The Court bases its decision of today on the theory that 'a confession is inadmissible *if* made during illegal detention *due to failure promptly to carry a prisoner before a committing magistrate, whether or not* the "confession is the result of torture, physical or phychological * * *"'" and "but the *rule* now announced forces exclusion of *all confessions given during* [*such*] *illegal restraint.* It will shift the inquiry to the legality of the arrest and restraint, rather than to whether the confession was voluntary. *Such exclusion becomes automatic on proof of detention in violation of*

*the commitment statute, followed by a confession to police officials before commitment.*" and "It is because illegal detention was not thought to be per se coercive that it was necessary to create the McNabb rule of exclusion. * * * The Court now says that *illegal detention alone* is sufficient to bar from evidence a confession to the police *during that unlawful detention.* * * * Apparently the Court intends to make the rule of commitment 'without unnecessary delay' an iron rule without flexibility to meet the emergencies of conspiracies, search for confederates, or examining into the ramifications of criminality. The Court does this by failing to distinguish between necessary and unnecessary delay in commitment. * * * All, I think, without any need for such action since every coerced confession has been [constitutionally] inadmissible for generations." [335 U.S. 410, 69 S.Ct. 176.] (Emphasis supplied.)

Measured by this yardstick of what appears to be a most careful and painstaking appraisal I see no other course open to us than to follow the rule and reverse. However, I emphasize that my concurrence rests *solely* upon the fact that appellant was not arraigned prior to being interrogated by the Marshal and prior to the making of the confession. The evidence in this case convinces me that the confession was freely made and was not the product of any form of promises or inducement that would or should vitiate it. I am in complete agreement with Judge Pope's comment that if the *drastic departure* from "previous notions" (as to admissibility of confessions) is to become binding on federal courts, this vital change should be accomplished by Congress and not the courts.

I express a final thought which comes as the outgrowth of years of observation and sufficient experience to justify my misgivings. There is implicit in this case the appalling possibility that a brutal murderer who had reached the maturity of manhood and who fully understood the nature of his horrible crime, may possibly escape punishment because of the suppression of this confession. Even though there is other evidence in the case which tends to connect

appellant with the murder and corroborates the truth of his confession, a cautious and careful prosecutor might well conclude that this additional and corroborative evidence, standing alone, would not, in the event of a new trial, be sufficient to establish guilt of murder beyond all reasonable doubt. In such an event the murder charge might be dropped—a far from unusual circumstance in the course of criminal prosecutions. It is because of the possibility of such a culmination that cases like this induce the sense of frustration and futility which now assails so many law abiding people as they contemplate the failure of the law to bring obvious criminals to justice. Oceans of argument and rules of evidence will not explain away such failures at a time when organized and unorganized lawlessness and gangsterism of the most vicious sort constitute a terrifying threat to our entire social order—and what is even more ominous right now, to the peace of the whole world.

POPE, Circuit Judge (dissenting).

As I read Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 171, 93 L.Ed. 100, I am convinced that it does not require the result here reached, and that what we are about to do is to extend the doctrine of that case beyond its intended or proper boundaries.

The language of the Upshaw case, expounding the McNabb case, is that the confessions were there rejected because the defendants were questioned "while held in 'plain disregard of the duty enjoined by Congress upon Federal officers' promptly to take them before a judicial officer", and that the McNabb confessions were "induced by illegal detention". The confessions in the Mitchell case, United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, were distinguished because made "before any illegal detention had occurred." Upshaw's confession was held to have been

given while he was "illegally detained for at least thirty hours for the very purpose of securing these challenged confessions." Therefore, it was said, the confessions were " 'the fruits of wrongdoing' by the police."

The plain fact here is that when Carignan gave his confession he was not being held in disregard of any duty on the police officers. There was no "illegal detention". He was being lawfully held after commitment upon a charge of attempted rape. The confession was not "the fruit of wrongdoing" by anyone.

Yet this confession which the majority of us are agreed was entirely voluntary, and given by Carignan when he was not only under neither physical nor psychological pressure, but in fact being treated with kindly consideration[1] may never be used as evidence because of the argument that had Carignan been brought before a magistrate upon a new charge, and then for a second time being informed of his right to retain counsel, he might then have asked for counsel when charged with this, more serious, offense. The questioning officer is criticised for the "faintness" of his warning that Carignan was entitled to counsel. It is said that upon a second commitment, the magistrate's reiteration of his right to counsel would have given him more emphatic warning of this right.

Now if it be conceded, as is done by Judge Healy, that a prisoner lawfully in confinement is not immune to gentle questioning, this whole thing comes pretty close to holding that a confession cannot be taken in the absence of the accused's lawyer.

It is not too easy to think clearly on these matters when dealing with the case of one sentenced to death. But if we move from this agitated field of homicide to the comparatively quiet area of, say, robbery, we can more calmly survey the problem, which, after all, is no more than a search for a means to ascertainment of the truth. Assume a case in which the police have

1. The officer gave Carignan a pad and pencil and permitted him to write what he had to say, in his cell. The officer was not present when the writing was done. After it was composed the prisoner was told that if he wished he could "tear it up and flush it down the toilet." There was no continued or continuous questioning. When Carignan asked for a priest, on two occasions, his wish was promptly granted.

been confronted with a dozen holdups of branch stores, where the circumstances disclose similarities in the manner of commission of these crimes. The police discover probable cause for charging the accused with one of the robberies, and he is so charged, bound over and committed. While thus being held, the accused makes a statement admitting commission of all the others.

Certainly my associates would not say that the statement would be inadmissible because of the want of eleven more commitments, as such. What I understand them to be saying is that the commitments are required in order to bring home to the accused, eleven more times, his right to counsel. What I think they have done is to make a new rule relating to confessions. They have, in effect, lifted out of context the requirement that an accused, upon trial, shall "have the Assistance of Counsel for his defense", unless "there is an intelligent and competent waiver [of this right to counsel] by the accused." Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461. I think that until now it has never been held that such a requirement be a prerequisite to the admissibility of a confession. As a practical matter, this would do much to dry up confessions as a means of getting at the facts in criminal cases, for as we know, "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances."[2] I think if there is to be any such drastic departure from previous notions as to the law, it should be accomplished by Congress, rather than by the courts.

I think we are all agreed that the continued and growing insistence of the courts upon strict adherence to the rules established for the protection of defendants accused of crime has had a salutary effect upon the administration of justice. For one thing, it has required more careful and thorough preparation and presentation of their cases by prosecutors, and the decisions relating to confessions have put the police on their toes to procure other evidence and to rely less upon the easier process of exacting confessions.

But where a confession "rings true", as does this one, where in all the circumstances of its giving there is no single thing which suggests that it might be untrustworthy, the prosecutor, as the representative of the public interest, is entitled to have the confession before the jury, and the court cannot shirk its share of duty in the search for truth by rejecting it where no reason for distrust exists.

The only sound reason for excluding certain confessions is that stated by Chief Justice Shaw in Commonwealth v. Morey, 1 Gray, Mass., 461, 462, as follows: "The ground on which confessions made by a party accused, under promises of favor or threats of injury, are excluded as incompetent is, not because any wrong is done to the accused in using them, but because he may be induced, by the pressure of hope or fear, to admit facts unfavorable to him without regard to their truth, in order to obtain the promised relief or avoid the threatened danger, and therefore admissions so obtained have no just and legitimate tendency to prove the facts admitted."

Hence confessions obtained by the "third degree", by prolonged and exhausting interrogations, by various forms of psychological pressure, are suspect, for as Mr. Wigmore says, (§ 822) it may be that "the untrue acknowledgment of guilt is at the time the more promising of two alternatives." The same may be true where the confession is made "during illegal detention", especially where such detention was "for the very purpose of securing [the] challenged confessions."

The logic of those rules, cannot, in my opinion, be extended to this case. That no attorney attended Carignan's confession,

2. Mr. Justice Jackson, concurring in result, in Watts v. Indiana, 338 U.S. 49, at p. 59, 69 S.Ct. 1347, 1357, 1358, 93 L. Ed. 1801. The statement quoted in the opinion from the dissent of Mr. Justice Reed in the Upshaw case, is no more than an expression of the same idea. I am unable to see how this extract from the dissenting opinion aids this court's construction of the majority opinion in Upshaw.

or that the officer did not more emphatically bring the hiring of an attorney to his attention does not throw doubt upon the confession or suggest any reason for suspecting an untrue acknowledgment of guilt.

One who deprives a litigant of the testimony of a witness by threats or intimidations such that the witness refuses to testify, is guilty of an offense under Title 18, § 1503, relating to "Obstruction of Justice". I think that before we say that the United States may never use this confession as evidence we should take great care lest, for too unsubstantial reasons, we also obstruct justice, not only in this, but in other cases to follow.