Xavier Maxine **DUGAS**, Administrator of the Estate of Kathryn Cecile Dugas, Deceased

v.

**NATIONAL AIRCRAFT CORPORATION** and

James Hart, Administrator c.t.a. of the Estate of Theodore H. Hart, a/k/a Theodore Henry Hart, III, Deceased.

Betty R. **GUISINGER**, Administratrix of the Estate of Christina M. Hart, Deceased

v.

**NATIONAL AIRCRAFT CORPORATION** and

James Hart, Administrator c.t.a. of the Estate of Theodore H. Hart, a/k/a Theodore Henry Hart, III, Deceased.

Civ. A. Nos. 40748, 40749.

United States District Court, E. D. Pennsylvania.

March 28, 1972.

Freedman, Borowsky & Lorry by Milton M. Borowsky, Philadelphia, Pa., for plaintiffs.

Montgomery, McCracken, Walker, & Rhoads by Sidney L. Wickenhaver, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

I.

On February 24, 1970, I filed an Opinion and entered a judgment awarding damages to the parents for the death of two minor children who were the victims of an airplane accident.[1] Having first determined that the estate

---

1. Dugas v. National Aircraft Corp., 310 F.Supp. 21 (E.D.Pa.1970).

of the pilot, Theodore H. Hart, was solely liable and exonerating the owner of the aircraft, National Aircraft Corporation, I awarded damages both under the Pennsylvania Survival Statute, 20 P.S. § 320.601 and under the death on the High Seas Act, (DOHSA), 46 U.S.C. §§ 761, 762. The awards, under the Pennsylvania Survival Statute, 20 P.S. § 320.601 were (1) Xavier Maxine Dugas, as administrator of the Estate of Kathryn Cecile Dugas, $15,000 and (2) Betty R. Guisinger, as administrator of the Estate of Christina M. Hart, $18,000. In addition, under the Death on the High Seas Act, the original awards were as follows: (1) Mrs. Virginia Dugas—$15,000 plus interest, (2) Mr. Xavier Dugas—$6,000 plus interest, and (3) Mrs. Betty R. Guisinger—$17,000 plus interest.

The defendant appealed and on February 26, 1971 the United States Court of Appeals for the Third Circuit filed an Opinion[2] remanding the case "for more specific findings on basic facts . . . as well as for a discussion of its [the District Court's] conclusions showing that all relevant factors have been considered in making any awards [as to the Death on the High Seas Act] which the record as supplemented . . . may justify:

1. The beneficiaries' ages, life expectancies (footnote omitted), income and alternative means of support.

2. Annual sums which the children would have contributed to the parents.

3. Other future obligations which the children could have been expected to have in addition to their desire to help needy parents.

4. Method of reduction to present worth, including consideration of actuarial and present worth data.

5. Such other factors as the record, as supplemented, may make relevant.[3]

It should be noted that the Court of Appeals affirmed my prior findings as

to the liability of the pilot, the *nonexclusivity* of the remedy under the DOHSA, the $15,000 damages to Mr. & Mrs. Dugas and the $18,000 damages to Mrs. Guisinger awarded under the Pennsylvania Survival Statute. Thus, the remand only affected the *amount* of the award, if any, to be made under the DOHSA and not the *liability* of the pilot under the DOHSA which was established and affirmed by the Court of Appeals.

## II.

### SUPPLEMENTAL FINDINGS OF FACT

1. On December 29, 1965, Kathryn Dugas and Christina Hart were sixteen years of age and in good health with the prospect of enjoying a normal life expectancy of 60.8 years.

2. On December 29, 1965, Virginia Dugas, the mother of Kathryn, was 41 years of age, with a probable life expectancy of 36.8 years. (N.T. 4, Sept. 9, 1971; Ex. P–A–2)

3. On December 29, 1965, Xavier Dugas, father of Kathryn, was 42 years of age, with a probable life expectancy of 30.9 years.

4. On December 29, 1965, Betty Guisinger, mother of Christina Hart, was 37 years of age, with a probable life expectancy of 40.6 years. (N.T. 4, Sept. 9, 1971; Ex. P–A–1).

5. Xavier Dugas, father of Kathryn, has a gastric ulcer and has suffered from recurrent attacks of pericarditis. There is some evidence that this condition has worsened and that it has had some effect on his working and life expectancies. (Ex. P–A–3).

6. Xavier Dugas, father of Kathryn, is regularly employed at a salary which amounted to $10,777 per annum in 1969, and the record has not been supplemented to show his present salary. In addition, Mr. Dugas is entitled to and receives a pension of $214.97 per month for his past service in the Marine Corps,

---

2. Dugas v. National Aircraft Corporation, 438 F.2d 1386 (3rd Cir. 1971).

3. 438 F.2d at 1395–1396.

and is entitled to receive this amount of pension for the rest of his life. Mr. and Mrs. Dugas have a son older than Kathryn and four other children younger than Kathryn.

7. Betty Guisinger, mother of Christina Hart, is regularly employed as a federal civil servant, receiving a salary of $7,400 per annum in 1969, and the record has not been supplemented to show her present salary. Mrs. Guisinger has a son three years younger than Christina.

8. Both Kathryn Dugas and Christina Hart would probably have attended college, and each of them had the ability and capacity to become a teacher or its professional equivalent and to attain at least the earnings which an average school teacher would have attained. In addition, there is a possibility that Christina Hart might have attended medical school and become a physician.

9. Both Kathryn Dugas and Christina Hart would probably have married and had children and would probably have applied a substantial part of the earnings which they received from employment to the use and support of themselves, their spouses and their children.

10. Following her graduation from college and her entry into the labor market in 1972, Kathryn Dugas would have rendered services and monetary aid averaging $338.00 per annum to her mother whose life expectancy would then be 31.4 years, and to her father, Xavier Dugas, whose life expectancy would then be 24.9 years, an average of $226.00 per year. Reduced to present value at 6% interest, this would amount to $4,729.00 and $2,884.00 respectively.

11. Following her graduation from college and her entry into the labor market in 1972, Christina Hart would have rendered services and monetary aid to her mother, Betty Guisinger, on the average of $500 per year throughout her mother's then life expectancy of 35.0 years. This sum reduced to present value at 6% interest amounts to $7,249.00.

12. Kathryn Dugas and Christina Hart, if they became teachers and remained single, would have each had an estimated statistical lifetime earnings residual after personal consumption of $98,824. (N.T. 34, September 9, 1971)

13. Kathryn Dugas and Christina Hart, if they became teachers and married, would have each had an estimated, statistical lifetime earnings residual after personal consumption of $134,468. (N.T. 40–41, September 9, 1971).[4]

### III.

In accordance with the very specific remand of the Court of Appeals, Dugas v. National Aircraft, *supra*, 438 F.2d at 1395–1396, I have made additional findings of fact to support the reduced awards now given under the DOHSA. In my original Opinion, Dugas v. National Aircraft, 310 F.Supp. 21, 26–29 (E.D.Pa.1970) (Parts IV A & B), I set forth in Part IV A the cases and authorities which hold that parents may recover damages for the period after the minor child would have reached majority. Secondly, I concluded in Part IV B of my prior Opinion that loss of society and companionship and loss of investment were not proper elements of damages under the DOHSA. *Dugas, supra*, 310 F.Supp. at 27–28. In reviewing my original findings, the Court of Appeals specifically affirmed my "careful reasoning * * * on the elements of damages contemplated by the DOHSA as stated under IV–A and B of [its] opinion. . . ." *Dugas, supra*, 438 F.2d at 1392.

In the Supplemental Findings of Fact, *supra*, I have expressly excluded any award for the period prior to the time the decedents would have graduated from college and begun work. In so finding, I have considered that it is likely that the total expenses incurred by parents in raising children, including

---

4. It should be noted that the married residuals reflect only personal consumption and not expenditures on behalf of the remaining members of their immediate families.

food, clothing, entertainment, college tuition, and other miscellaneous expenses more than offset any income which these children would have earned and given to their parents from babysitting and other after-school employment. Thus, I here find that prior to reaching majority and entry into the labor force, these children would not have made a net financial contribution to their parents.

Turning now to the period following the children's graduation from college and entry into the labor force, I have endeavored to correct any deficiencies in my original findings of fact. In addition, the plaintiffs have presented at a hearing on September 7, 1971, the testimony of Dr. Andrew Verzilli, a noted economist. Dr. Verzilli's testimony has enabled me to more precisely estimate the potential earning ranges which the children would have had. My new awards under the DOHSA are based both on the supplemental record and on the other additional evidence put in by the parties. Thus, I find that on a total view of the record as supplemented, there is sufficient evidence to support an award under the DOHSA of $7,613 to Virginia and Xavier Dugas and $7,249 to Mrs. Betty Guisinger.[5]

### IV.

In order to comprehend fully my awards under the DOHSA, a brief review of the findings of fact and their support in the evidentiary record is appropriate.

The award to Xavier and Virginia Dugas of $2,884 and $4,729 respectively, is based on, *inter alia*, the evidence in the record that Miss Dugas, the decedent, would probably have attended college and become a teacher or its professional equivalent. Dr. Verzilli testified that the average, single teacher has an earnings residual after personal consumption of $98,824.[6] (Supplemental Findings of Fact, hereinafter "S.F.F." 12). It is likely that $564 per year of this residual would be used to aid her parents, especially her father, whose current state of health indicates a reduced working expectancy. (S.F.F. 6). In addition, Mr. and Mrs. Dugas' other children, four of whom are younger than Kathryn, would place a continuing burden on the family in the event the Dugas family was forced to rely solely on Mr. Dugas' Marine Corps pension (S.F. F. 6) because of his health problems. (S.F.F. 5)

The award of $7249 to Mrs. Guisinger, other of Christina Hart, is predicated on Miss Hart's expected lifetime earnings residual of $98,824 (S.F.F. 12) and Mrs. Guisinger's relatively lower income level of $7,400 per year in 1969 (S.F.F. 7). Thus, my finding that Christina would have contributed $500

---

5. My awards under the DOHSA were calculated as follows:

1. Xavier Dugas—In 1972 Xavier Dugas has a life expectancy of 24.9 years. I have found that Kathryn Dugas would have contributed $226.-00 per year to Mr. Dugas. I then used the annuity table found in Am. Jur.2d, Desk Book, Document No. 133 to find the annuity factor applicable to Mr. Dugas' life expectancy which is 12.760. Multiplying 12.760 times $226.00 per year produces the final figure of $2883.76 or $2884.00.

2. Virginia Dugas—In 1972 Virginia Dugas has a life expectancy of 31.4 years. I have found that Kathryn Dugas would have contributed $338.-

00 per year to Mrs. Dugas. Using the same annuity table as above, the factor applicable to Mrs. Dugas' life expectancy is 13.991. Multiplying 13.991 times $338.00 per year yields the final figure of $4,728.95 or $4,729.00.

3. Betty Guisinger—In 1972 Mrs. Guisinger has a life expectancy of 35.0 years. I have found that Christina Hart would have contributed $500.00 per year to her mother. Using the same annuity table as above, the factor applicable to Mrs. Guisinger's life expectancy is 14.498. Multiplying this factor times $500 per year produces the final figure of $7,249.-00.

6. N.T. 34, September 9, 1971.

dollars per year to the aid of her mother is reasonable as based on the record as supplemented.

More than two decades ago, Mr. Justice Frankfurter stated that " . . . there comes a point where this Court should not be ignorant as judges of what we know as men".[7] Similarly, there comes a point where we should not act as if we are ignorant of the inherent, nebulous variables which constitute the basis for an ultimate finding of damages in a death case, whether the damages are "found" by a jury or by a judge with a waiver of jury. My candid recognition of the imprecise aspects in any verdict cannot be changed by statements of general principles; for there are illusory aspects in any jury's verdict if the specific amount implies absolute precision in prognostication. For such precision is beyond the human capacity of any mortal. For we are asked to anticipate and predict the future of humans when we have neither omnipotent nor omniscient powers. As an example, week after week in death cases, juries consider the life expectancy of a specific claimant. We mask this guessing by approved instructions which state

> "Life expectancy, as shown by a mortality table, is merely an estimate of the probable average remaining length of life of all persons in the United States of a given age and sex, and that estimate is based upon a limited record of experience. So, the inference which may reasonably be drawn from life expectancy, as shown by the table, applied only to one who has the average health and exposure to danger of people of that age and sex.
>
> In determining the reasonably certain life expectancy of the plaintiff, the jury should consider, in addition to what is shown by the table of mortality, all other facts and circumstances in evidence in the case bearing upon the life expectancy of the plaintiff, including his occupation, habits, past health records and present state of health.
>
> When considering life expectancy, in determining any reasonably certain future damage, the jury will bear in mind, of course, the distinction between entire-life expectancy and work-life expectancy."

(Devitt and Blackmar, Federal Jury Practice and Instructions, 2d Ed., § 78.06).

What does this instruction actually mean? No finder of fact can predict whether any specific spouse will live to the exact time of the actuarial expectancy, or less, or longer. For if there were such omniscience, insurance companies would use the omniscient individual to set insurance premiums on specific individuals rather than relying on actuarial tables.

Thus, in this case, I concede, without shame, that the verdicts of damages awarded to Mr. and Mrs. Dugas and Mrs. Guisinger necessarily have an element of speculation for the future. Perhaps the awards should be larger, yet who can say that Miss Dugas would have lived her "three score and ten", for she might have been one of the 55,000 death victims of automobile accidents last year, or maybe she would have been a cancer victim in 1980. But, the law requires me to decide on the basis of an educated hunch. The 50,000 boys brought back in coffins from Vietnam are testimonial evidence of the unpredictibility of life expectancy. Similarly, in this case, if Miss Dugas had lived and her father had died in 1972, Miss Dugas probably would have contributed substantially more to her family than the $564.00 per year which I have awarded. On the other hand, if, in 1972, Mrs. Guisinger received a windfall such as winning a million dollar lottery, Miss Hart would probably never have contrib-

7. Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801.

uted an additional penny to her mother, Mrs. Guisinger.

I make these extended comments to note that I am not unaware of the frailties of human prognosis in this or any similar case. Yet, since I must deal with such frailties, I have attempted conscientiously to do that which I think juries do—speculate on the events which form the corridors of time, by gazing at the unknown, attempting to use some type of reasoned judgment, or what some might even call hunches.

For these reasons, I can be no more precise in predicting the future which Misses Hart and Dugas would have had in the corridors of their lives, and I cannot make more specific findings than have been noted above.[8]

When I made the original findings, I did not think then that the Death on the High Seas Act awards were excessively generous. Both then and now, I recognized that there could have been many circumstances wherein the decedents would have contributed substantially more than was provided in my prior awards. However, in light of the tone of the remand and the reasons noted above, I have decided to award reduced damages of $7613.00 to Mr. and Mrs. Dugas and of $7249.00 to Mrs. Guisinger under the Death on the High Seas Act.[9]

8. The traditional legend is that we could cut our backlog if the parties would more often waive jury trials, since non-jury trials would be more expeditious. Yet, there appears to be an almost unanimous concern among the trial judges in this District that in the long run they would prefer to have jury trials because the latter actually are more expeditious.

In the non-jury trials, we are required to spend many hours subsequent to trial preparing detailed written findings which are often subjected to an appellate microscopic scrutiny that is never possible in a jury's one sentence verdict that "we find for the plaintiff in the amount of X DOLLARS."

I make these comments not in any way intending to be disrespectful to the Court of Appeals exercising its important obligation to review carefully the record of this case and all cases on appeal; I make the comment merely because in many ways this case exemplifies the converse of the traditional legend on non-jury trials. Perhaps we have now reached the point where non-jury trials expand rather than diminish the backlog.

9. This Opinion is filed pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C. Rule 52(a) and constitutes my required additional findings of fact and conclusions of law.