94 So.2d 674

**STATE of Louisiana**

**v.**

**Donald Rufus EDWARDS.**

No. 43315.

April 1, 1957.

Noel L. Adams, Jr., Jack C. Wimbish, C. P. Brocato, Shreveport, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Edwin L. Blewer, Dist. Atty., Shreveport, for plaintiff-appellee.

HAMLIN, Justice ad hoc.

The defendant appeals to this Court from his conviction of the crime of aggravated rape denounced by LSA–R.S. 14:42 and his sentence to death by electrocution.

Defendant's counsel reserved nine bills to the rulings of the trial judge, but only seven are presented for consideration on this appeal.

Bill of Exceptions No. Two was reserved to the trial court's overruling defendant's challenge of Juror Claude Hamel.

During the examination on voir dire, Mr. Hamel stated that at a social gathering he heard a Member of the Grand Jury which indicted the defendant make the casual statement that he felt he had done his duty. Mr. Hamel stated that he placed no importance upon this casual statement, and that it would have no effect upon his verdict in the case if he were selected as a

juror. On further examination, Mr. Hamel stated that he had read press accounts of the crime and had formed an opinion or impression on the basis of what he had heard and read; but that since he had had the benefit of the instructions from counsel on both sides of the case and from the court, he felt that he could and would state that his opinion or impression was not a fixed opinion or impression. He further said that if selected as a juror, he could and would decide the case solely on the evidence that might be introduced in open court and on the law as charged by the court.

It is the contention of counsel for the defendant that "where the juror can try the accused on the law and evidence only, without interference from his past opinion or prejudice, then he is qualified," and does not fall within the prohibitions of LSA–R.S. 15:351. However, they argue that where a juror states that he has had an opinion as to the guilt or innocence of the accused in a case such as this, he should be excused.

█ The note of evidence, containing the questions propounded to Juror Hamel and his answers thereto, was not made a part of this bill. Therefore, we must accept as true the following statement of the trial judge in his per curiam to Bill of Exceptions No. Two:

"Being known to the Court as a citizen of intelligence and high character, the Court was convinced that Mr. Hamel was a qualified juror."

See State v. Wideman, 218 La. 859, 51 So.2d 96; State v. Delatte, 219 La. 715, 53 So.2d 906; State v. Hardy, 198 La. 1048, 5 So.2d 330; State v. Boudreaux, 137 La. 227, 68 So. 422.

█ Bill of Exceptions No. Two is, therefore, without merit.

█ Bill of Exceptions No. Three was reserved to the ruling of the trial court on the challenge of Juror John R. Murphy.

Mr. Murphy, who had been in the jury box during the questioning of a number of persons as to whether they belonged to the Louisiana White Citizens' Council, stated on voir dire that he did not belong to that organization, but that he believed in white supremacy.

It is the contention of counsel for the defendant that Mr. Murphy was prejudiced against the colored race and could not relieve himself of the prejudice. They argue that the defendant was denied the constitutional guarantee of a trial by his peers.

Since the testimony taken in connection with this bill was not transcribed, the same ruling applies as in Bill of Exceptions No. Two. The following per curiam of the trial judge, which must be accepted as true, ably explains the statement of this juror:

"* * * The juror, Mr. Murphy, had been in the box in the courtroom while these questions and answers were being given and received, and the last such case was just a few minutes before Mr. Murphy's examination on voir dire was begun by defense counsel. Mr. Murphy was asked if he belonged to that organization and Mr. Murphy replied that he did not, but that he believed in white supremacy. This was a voluntary statement on Mr. Murphy's part and was obviously given by Mr. Murphy to be frank. It was at this point that defense counsel asked Mr. Murphy what he thought white supremacy meant and it was in answer to that question by defense counsel that Mr. Murphy stated he did not believe the negro was his equal. He immediately explained by saying that he was referring solely to the field of social relationships. It is stated in the bill of exception that Mr. Murphy in giving his answer showed his prejudice by using the word 'nigger.' The Court was listening very closely to this examination, and the Court did not understand Mr. Murphy to say 'nigger,' but understood him to use the word 'negro,' and the Court did not discern any implication of prejudice in the juror's remark. It was also stated in the bill of exception that Mr. Murphy stated that he could not relieve himself of said prejudice. The juror made no such statement. Indeed, as will be shown by the Note of Evidence attached to this bill of exception, the Court dictated to the Court reporter at the time this incident occurred the explanation that Mr. Murphy gave of his statement. As indicated in the Court's remarks at the time, Mr. Murphy answered further questions by counsel for defendant that it was his personal opinion that a member of the colored race was his complete equal under and before the law and entitled to all of the rights, privileges and immunities before the law to which any other citizen was entitled. He further answered that he had no prejudice whatever against a member of the colored race and that he could and would try this case, if selected as a juror, solely on the law and the evidence. He further stated that the fact that the defendant in this case was a colored man and that the victim was a white woman would not interfere with his impartial consideration of the law and the evidence.

"Believing this to be true, the Court is of the opinion that Mr. Murphy was a qualified juror and the challenge for cause was therefore overruled."

We, therefore, find Bill of Exceptions No. Three to be without merit.

Bill of Exceptions No. Five was taken to the trial court's admitting in evidence

certain enlarged photographs and negatives of the accused's fingerprints.

Defense counsel objected to their admission in evidence for the alleged reason that they had not been sufficiently identified, in that the witness (Captain Booth) was not present when the negatives were developed and the photographs made, and that the defense had the right to cross-examine the person who made the negatives from the film and transferred the negatives to the prints.

 Since no evidence has been attached to this bill, we must take as true the trial judge's recitation of facts. See authorities cited under Bill of Exceptions No. Two, supra. The trial judge has more than fully complied with the requirements of Article 504 of the Louisiana Code of Criminal Law and Procedure, LSA–R.S. 15:504, and from his per curiam we find a complete explanation of defense counsel's objections. It explains that after the accused was arrested, Sgt. King of the Shreveport Police Department lifted his fingerprints from several objects at the scene of the crime. These prints were delivered to Lt. Davis, Sgt. King's superior, who testified that the prints were delivered to him in person. The prints were compared with prints taken of the accused after his arrest, and Lt. Davis and Captain Richard, Chief of the Shreveport Fingerprint Department, testified that the prints were identical. The prints were then taken

to the office of the State Bureau of Identification in Baton Rouge, and Captain Booth of the Bureau, a qualified fingerprint expert, confirmed that the prints were identical, and he testified to that effect on the trial. After confirming the identification of the prints, Captain Booth took enlarged photographs of all prints. He gave the films to a technical assistant and went with him into the dark room for the development of negatives. Captain Booth then made enlarged prints of the negatives, compared the prints with the originals, and testified that they were identical. Captain Richards also testified in the same manner. The enlarged prints were used in evidence at the trial.

We find no merit in Bill of Exceptions No. Five, particularly because of the above statement and the following statement from the trial judge's per curiam:

"When the State, after developing the facts as hereinabove stated, offered in evidence the enlarged photographs, the originals of the latent and known prints having previously been introduced in evidence without objection, the defense counsel made the objection which is the basis of this Bill of Exception No. 5. As will be shown by the bill of exception itself and the Note of Evidence attached, the objection of defendant's counsel was that the person who developed the film in the darkroom in Baton Rouge

was not present to testify that he had so developed it, and that the defense did not have the opportunity to cross-examine that person.

"The Court overruled the objection because, as stated hereinabove, Captain Booth had testified that he personally took the photograph with his own camera and that he went with his assistant or technician into the darkroom and remained there while the film was developed in his presence and under his supervision, and that he, himself, personally took charge of the developed negative upon its completion. In the Court's opinion the photographs were sufficiently identified and were competent evidence."

Bill of Exceptions No. Six was reserved when the trial judge permitted the introduction in evidence of the oral confession of the defendant over the objection of defense counsel.

The defendant's counsel contended that the necessary and proper foundation had not been laid by the District Attorney; and that the confession was not voluntarily made, because the accused was subjected to mental and physical duress. It was further argued that such alleged mental and physical duress was the means employed to secure the oral confession.

■ Whether a confession is given freely and voluntarily is a question of fact, which addresses itself to the discretion of the trial judge. State v. Cook, 215 La. 163, 39 So.2d 898; State v. Palmer, 227 La. 691, 80 So.2d 374; State v. Hilliard, 227 La. 208, 78 So.2d 835; State v. Michel, 225 La. 1040, 74 So.2d 207; State of Louisiana v. Isaac Peart, La., 93 So.2d 920.

There is no evidence attached to this bill, and, as stated in the bills discussed supra, the per curiam of the trial judge is controlling. Because of the gravity of the crime of which the defendant has been convicted and the serious nature of the sentence imposed, we quote in full the per curiam attached to this bill:

"When the District Attorney began to question Lieutenant Cecil L. Payne of the Shreveport Police Department leading up to the offering of an oral confession of the defendant to said witness and Detective M. U. James, counsel for defendant requested that the jury be removed, in order that the admissibility of such confession should be determined by the judge out of the presence of the jury. The jury was retired and for four or five hours testimony was presented for the purpose of laying the foundation for the admissibility of the confession. This evidence was not taken by the court reporter at that time and counsel for the defendant did not request that it be taken. At the conclusion of the evidence the Court ruled that the proper

foundation had been laid to show the free and voluntary character of the confession and that the same would be admitted in evidence before the jury. During the time that this legal foundation was being laid by the State all police officers who had any contact with the defendant from the time of his arrest shortly after midnight of the day following the date of the crime were called to the stand and examined by the District Attorney and cross-examined by counsel for defendant. The testimony given by these officers was substantially the same as that given by the same witnesses later on after the jury was recalled (which testimony was transcribed by the court reporter and is attached to Bill of Exception No. 7), with a few exceptions, which we here note. Without rehashing here the testimony of the officers, the Court now states that the testimony of these officers conclusively established that the defendant was not at any time put under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. Every officer who testified, testified positively that the defendant was not abused in any way, that he was not struck by any person at any time, that he was not threatened by anyone, and that he was not promised anything or offered any inducements to make a confession. It will be observed from the transcribed testimony attached to Bill of Exception No. 7 that after the defendant's arrest at the house of his girl friend, shortly after midnight, he was brought straight to the police station and taken into the office of Chief of Detectives Wayne Bateman. As will be seen from the per curiam to Bill of Exception No. 9, the arresting officers had found on the defendant and in the room in which he was in bed at the time of the arrest, the victim's diamond wedding ring and other items which had been taken from the victim's home. The officers began questioning the defendant, probably around two o'clock in the morning, and the same continued at intervals until after daylight, or somewhere around 6:30 or 7:00 o'clock. Most of the questioning was by Lieutenant Payne and Detective James. From the time defendant was brought into the police station until the questioning ceased and he was carried upstairs to the jail and put into a cell, Public Safety Commissioner Earl Downs and Chief of Police Harvey Teasley, or one of them, was present at all times supervising the interrogation.

"The office in which the defendant was being questioned was a small office opening onto the main hall of the Municipal Court Building. In it was

a desk, a swivel chair and two straight-backed chairs. The evidence indicates that after the defendant had been questioned for some time while standing with his hands handcuffed behind his back, one of the officers brought up a coca-cola box to permit the defendant to sit down. Defense counsel on cross-examination emphasized that this was a form of duress and abuse, but we cannot agree. The testimony shows that when first arrested the defendant was sullen and uncommunicative and Commissioner Downs stated in his testimony to the Court that they felt they were dealing with a desperate criminal and the handcuffs were kept on him as a precaution against escape or any other untoward incident.

"We pause at this point to observe that the opinion of the Commissioner and the officers on this point was a wise one. The defendant in this case is a young, powerful, athletic negro, approximately twenty-two years of age. His desperation was later demonstrated to this Court when, after the jury returned into court with a verdict of Guilty as Charged and the Court ordered the verdict of the jury to be recorded and the prisoner remanded into the custody of the sheriff to await sentence, three deputy sheriffs led him without handcuffs out of the courtroom to the jail elevator situated immediately outside of a rear door of the courtroom. Between this door and the elevator is a narrow stairway, leading up to the jail floor in one direction and down into the open basement of the courthouse in the other direction. Just after the deputies passed outside the courtroom door to approach the elevator door, this defendant suddenly and without any warning attacked two deputies walking in the rear of him, shoved them into each other, and bolted up the stairs. Before the deputies could recover from this sudden assault the defendant successfully made his way up the stairs to between the third and fourth floor elevations, pulled himself up above some iron bars on the lower part of a window and dived headfirst through the upper part of a glass window out onto the roof of a wing of the courthouse probably fifty feet above ground level. Two shots from one of the pursuing deputies were fired at defendant as he was crashing through the window, but missed. The defendant then ran to the edge of the roof and, with the deputy in pursuit, defendant either fell or jumped the fifty feet to the ground, got up and ran across the courthouse square, up an adjoining street, and again dived head-first through a ground level window in a nearby church. He made his way to the top of a tower of the church some six to eight stories high and was seen

from the street hanging by his hands outside the top window, apparently with the idea of dropping to an adjoining building roof. For some reason he was seen to pull himself back into the building where he was a few minutes later cornered by pursuing officers who had followed him by a trail of blood resulting from a cut on his hand, rearrested, and returned to jail.

"During the morning hours during which the officers were questioning the defendant he was permitted to smoke and was given refreshment, and food along about 6:30 or 7:00 o'clock. During all of this questioning the defendant had never made any confession but was making answers to questions propounded to him by the officers concerning his movements on the night of the crime, the items mentioned above which had been taken from the house, and questions of that nature. The evidence shows that the handcuffs were removed from the defendant some time around 4:30 or 5:00 o'clock in the morning, and some time later he was removed to Commissioner Downs' office where he was seated. The testimony also shows that some time after seven o'clock the District Attorney was called by the Commissioner, and the District Attorney called his First Assistant, and together they went to the police station and went to Commissioner Downs' office, which also is located on the main hall of the building, where they found the defendant seated in perfect comfort. The District Attorney and his assistant questioned the defendant for some time, and both testified he was perfectly calm and cool and mentally alert. They saw no evidence of any abuse and both testified that the defendant did not even appear to be weary. Their testimony given to the judge is in substance the same as that they gave after the jury was recalled, and which is in the Note of Evidence attached to Bill of Exception No. 7.

"When the State had concluded with all of the officers who had had any contact with the defendant between the time of his arrest and the time he made his confession, counsel for the defense requested permission to put the defendant on the witness stand for the limited purpose of controverting the evidence of the officers pertaining to the voluntary character of the confession. This was permitted and the defendant was sworn and he testified for that restricted purpose. The defendant did testify that Lieutenant Payne slapped him one time while the interrogation was in progress, that one of the officers whom he could not identify hit him over the head with a rubber hose pipe, and one kicked him on his

leg. No other evidence was offered by the defendant. Lieutenant Payne and the other officers were recalled. Lieutenant Payne flatly denied that he had slapped the defendant, and all the officers testified that no one struck the defendant with a hose pipe or kicked him on the leg.

"Counsel for defendant emphasized on their cross-examination and argued to the Court against the admissibility of the confession that the defendant was promised that if he would make a confession he would be permitted to see his mother. The officers denied this and, when the defendant was on the stand, he was asked by his counsel if anybody at any time promised him that if he would make a confession he would be permitted to see his mother. The defendant answered that no one at any time promised him that if he would make a confession or any statement he would be permitted to see his mother. And the defendant himself did not testify that the oral confession which he made later on was not his own free and voluntary act and statement.

"Now the evidence showed that after the District Attorney and the Assistant District Attorney questioned the defendant in the Commissioner's office around eight o'clock that morning, all questioning ceased and the defendant was carried upstairs and put in a cell by himself. This cell is described in the testimony of Captain Regions, the City Jailer, which testimony is attached to Bill of Exception No. 7. It is a cell of adequate size, having two beds (a double-decker), a commode, a wash basin and running water, and a large window almost the width of the cell. The defendant remained in that cell, alone, until some time after twelve o'clock when, as Captain Regions was either making the rounds to pick up the breakfast plates or in the act of distributing the noon meal, the defendant asked Captain Regions if he would call Detective M. U. James. The evidence shows that Detective James knew the defendant and had known his family for a long time. Captain Regions communicated defendant's request to Detective James who, in turn, called Lieutenant Payne, and the two went to defendant's cell and asked him what he wanted. Defendant stated that he wanted to tell them the truth about what had occurred. These two officers took the defendant into an adjoining room, known as the Fingerprint Room, and the three sat down at a table and the defendant proceeded to make the oral confession which the two officers recited to the judge while the jury was retired, and which they repeated after the jury had been returned. It was to the recitation of this

oral confession before the judge while the jury was retired that this Bill of Exception No. 6 was reserved. And to the same recitation after the jury had returned, Bills of Exception Nos. 7 and 8 were taken.

"Lieutenant Payne made written notes in a little pocket notebook which he had on his person of what defendant said. The substance of the confession was as follows:

" 'Defendant left his mother's house during the early part of the night and after detailing the route he followed, came to the home of the victim in this case. He walked up the driveway and went to a side door which opened onto a patio porch. This door was locked and he went around on the other side of the house and tried another door near the garage. This door was unlocked. He opened the door and went into the house. When he got into the house he then went to the door opening onto the patio which he had first found locked, opened it and propped it open with a flower pot sitting nearby. Defendant stated that he then took off his shoes and put them on top of a barbecue pit at the edge of the patio in the back yard, and then went back into the house through the patio door. The defendant stated that there were about three dim lights on in the house and that he began searching through some dresser draw-

ers looking for money; that he went into three bedrooms in the east end of the house and in one he found three silver dollars and three $1.00 bills. He said the three silver dollars were in a drawer and the three $1.00 bills were in a pocketbook. He then came out of the room and walked down the hall toward the sitting room. He looked into another bedroom and there were two beds in the room and he saw that someone was in one of the beds. He walked into the room and over to the bed. He woke the person by a shake on the shoulder and discovered it was a lady. When the lady woke up he asked her where was her money and for her not to holler. He stated that at this time he took his knife out of his pocket and opened it and she told him she did not have any money. The lady raised up in the bed to see who he was, and defendant stated that he told her to take her pajamas off. He said the knife was in his hand. He said that the lady took her pajamas off and he got in the bed, unbuttoned his pants and had an intercourse with her. He said he then got up and the lady got up out of the bed and he asked her again if she had any money and she again said that she did not. He then asked her 'if the kid had any bank around here,' and she answered 'no.' He said the lady then walked over the house showing him that she did not have any money and he

was walking close by her with his knife open in his hand. Defendant stated that they walked through the sitting room into the dining room where he made the lady lie down on the floor and while he still had the knife in his hand he got down on top of the lady on the floor to have another intercourse with her but that something came over him and he did not complete the act. He said that he then went back to the bedroom in the east end of the house where the lady asked him 'if he wanted her ring.' He said he told her 'yes' and she took it off her finger and gave it to him. He asked her if she had any money in the bank and she replied 'A little, about $500.' He then told her to write him a check and she wrote him a check for $300. Defendant stated that the light from the bathroom made it fairly light in that bedroom and he saw that a tatoo on his left arm was noticeable, since he was wearing a short-sleeve sport shirt. He then opened a closet door and got a green jacket and put in on to cover up the tatoo. He was then looking through some jewelry boxes. The lady had not had on any clothes whatever from the time she had gotten up off the bed. The knife he was carrying had a yellow handle and a wide blade. At this time while he was looking through the jewelry boxes the lady broke and ran out of the house. She ran out of the front door and he ran out of the back door, grabbed his shoes from off the barbecue where he had left them, and ran towards the bayou bridge leading into Broadmoor. He said that near a schoolhouse he took off the green jacket and threw it away. He said he also threw the check away. He said he also threw away a manicure kit. He said he did not throw away the lady's ring, the $6.00, a cigaret lighter, and some costume jewelry. He said that while he was running he threw away his knife and came on up through Broadmoor into Valencia, the latter being a negro subdivision. He said he took off the sport shirt he was wearing and rolled it around some rocks and threw it into a bayou near Stoner Hill School, and that he then went on to his mother's house at 1647 Royal Street. He also stated that all the time he was in the lady's house he had a white handkerchief over his face.

" 'Defendant stated that when he arrived at his mother's house there was no one there. He changed clothes and after a time cooked himself some eggs and ate them. He then went back over to his girl friend's house and she was mad at him for having stayed out all night and he went to bed and the girl friend left the house. She later returned and got in bed with him and they slept until about three o'clock in the afternoon. They got up and then went

back over to his mother's house and there was still no one there. They then went to his girl friend's mother's house and stayed there for some time. After that they went to the grocery store, got some groceries and then went back home to his girl friend's house and cooked themselves something to eat and then went to bed again and were in bed asleep when the officers knocked on the door shortly after midnight when he was arrested.'

"The court is of the opinion that the evidence clearly establishes that at no time after the defendant's arrest and while he was being interrogated was he subjected to anything of a character to force or induce a confession. Moreover the oral confession which he did make was made some four or five hours after this questioning had ended and when he was in complete ease and comfort. The Court is convinced that the defendant decided of his own volition to send for Officers James and Payne and make a complete statement of the entire affair. We think the confession was free and voluntary, admissible in evidence, and that this bill of exception is without merit."

1. Bills of Exceptions Nos. Six, Seven, and Eight are related. The trial judge's per curiam to Bill of Exceptions No. Six is referred to in his per curiam to Bills of Exceptions Nos. Seven and Eight.

A careful study of the above per curiam discloses no manifest error in the trial judge's ruling, and, therefore, we find no merit to Bill of Exceptions No. Six.

Bills of Exceptions Nos. Seven and Eight were reserved to the ruling of the trial judge that the oral confession of the defendant was freely and voluntarily made to Lt. Cecil L. Payne and Detective M. U. James.

To these two bills is attached the testimony of an arresting officer (J. C. Broome), that of the police officials who questioned the defendant, and that of the District Attorney and his Assistant. A thorough reading of this testimony convinces us that the findings of the trial judge in his per curiam to Bill of Exceptions No. Six [1] are correct. We believe that the defendant's oral confession was free and voluntary, and that it was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Article 451, Louisiana Code of Criminal Law and Procedure, LSA–R.S. 15:451.

It is further contended that the confession of the defendant was given at a time when he had not been booked, and that this constituted a violation of Article 77 [2] of the

2. "Every peace officer making an arrest or who shall have turned over to him any person arrested by a private person and any person making an arrest of another person shall immediately conduct

Louisiana Code of Criminal Law and Procedure, LSA–R.S. 15:77.

█ Since we find that the confession was made voluntarily, we do not believe that the trial judge erred in permitting it to be introduced in evidence, even though the defendant was not booked at the time it was given. Police officers are amenable to law, but their failure to strictly comply with its provisions would have no bearing on the present matter. In State v. Taylor, 173 La. 1010, 139 So. 463, 471, we said:

"They" (defendants) "contend that under Act No. 20 of 1928 and article 77 of the Code of Criminal Procedure they should have been taken immediately after their arrest to the nearest police precinct station and not to police headquarters. They aver that when they arrived at police headquarters they were surrounded by a number of people, among whom were many police officers, and that the atmosphere of the place was heavy with hostility.

"Act No. 20 of 1928, according to its title, was adopted to define the authority of the district judges throughout the state and the recorders of the city of New Orleans to grant bail or to parole

the person arrested to the nearest jail or police station and then and there. cause him to be booked, that is to say, shall cause to be entered on the book to be kept for that purpose the name of the prisoner and the crime or violation of ordinance charged against him and

or release in such cases, and providing a penalty for the violation of the act. The statutory provision, as well as article 77 of the Code of Criminal Procedure, referred to by defendants providing for the carrying of a person under arrest to the nearest police station to be then and there booked, the record whereof is always to be kept open to public inspection, were apparently enacted to facilitate and to protect persons arrested in obtaining their release on bail or on parole. It may be that the officers who arrested the defendants were amenable to the law, but we fail to see what bearing the statute or the codal article have on the present inquiry.

"The desperate manner in which the defendants had committed the series of crimes for which they were being sought justified the number of police engaged in their pursuit and the use of force and firearms in effecting their arrest. The statements of the defendants were not made in the presence of a mob composed of citizens and policemen, but were made in the private office of the chief of police in the presence only of the assistant district attorney, the

for which he shall have been arrested. Said book shall always be kept open for the inspection of the public, and the officer in charge shall furnish without cost a certified copy of the entry thereon to any person desiring such copy."

chief of police, and three or four police officers."

Counsel for the defendant rely on the recent case of Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 284, 1 L.Ed.2d 246, as authority for their contention that the conviction and sentence should be set aside because defendant's oral confession was made under alleged mental and physical duress. The following statement of the United States Supreme Court, compared with the facts of the present case as found by the trial judge in his per curiam to Bills of Exceptions Nos. Six and Nine, shows that the case is not apposite:

"Here the prisoner was an uneducated Negro, certainly of low mentality, if not mentally ill. He was first arrested by civilians, lodged in jail, and then removed to a state prison far from his home. We do not criticize the decision to remove the prisoner before any possibility of violence might mature, but petitioner's location and the conditions of his incarceration are facts to be weighed in connection with the issue before us. For a period of a week, he was kept in isolation, except for sessions of questioning. He saw no friend or relative. Both his father and a lawyer were barred in attempts to see him. The protections to be afforded to a prisoner upon preliminary hearing were denied him, contrary to the law of Alabama. He was questioned for several hours at a time over the course of five days preceding the first confession, and again interrogated at length before the written confession was secured.

"* * * The totality of the circumstances that preceded the confessions in this case goes beyond the allowable limits. The use of the confessions secured in this setting was a denial of due process.

"Neither Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522, nor any of the other cases relied on by respondent stands in the way of this conclusion. In Stein, the Court said:

"'The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.' 346 U.S. at page 185, 73 S.Ct. at page 1093.

"That is the same standard that has been utilized in each case, according to its total facts. Cf., e. g., Watts v. State of Indiana, 338 U.S. 49, 53, 69 S.Ct. 1347, 1349 [1357], 93 L.Ed. 1801 [1804]; Lyons v. State of Oklahoma, 322 U.S. 596, 602–605, 64 S.Ct. 1208,

1212, 1213, 88 L.Ed. 1481 [1485–1487].
* * * "

We, therefore, find no merit in Bills of Exceptions Nos. Seven and Eight.

■ Bill of Exceptions No. Nine is based upon the ground that the verdict rendered by the jury is contrary to the law and the evidence, and it is also based in part on the matters covered by Bills of Exceptions Nos. Two through Eight. Bill No. Four was abandoned.

Since we have not had the advantage of having testimony attached to any of the bills taken—except to Bills Nos. Seven and Eight—we quote the per curiam of the trial judge to substantiate our holding that there is no merit to Bill of Exceptions No. Nine:

"This bill was reserved when the Court overruled defendant's motion for a new trial. Although the bill states that it is based in part on the matters covered by Bills of Exception numbered 2 through 8 inclusive, Bill No. 4 has been abandoned. In so far as this bill of exception is based upon the errors alleged in the perfected bills of exception, the per curia to said perfected bills cover the instant bill.

"In so far as this Bill No. 9 is based upon the contention that the verdict of the jury was contrary to the law and the evidence, it is without merit. We reiterate here the statement which appears in the reporter's note attached to

the bill, which we made at the time the motion for a new trial was overruled.

"The evidence abundantly and overwhelmingly established the following facts:

"In the early morning hours before 3:00 A.M. on the date stated in the bill of indictment the victim of this aggravated rape was asleep alone in her home. Her husband and eleven year old daughter were in Washington, D. C. where her husband was combining a business trip with the pleasure of having his daughter with him. The lady testified that she was awakened when a man aroused her by shaking her. She made an outcry and he placed an open knife at her throat, threatening to kill her if she made any further noise. She testified that she received a cut on the side of her neck. This was confirmed by the doctor who attended her and by the presence of a splotch of blood on the pillow. She testified that the man was a young negro. This fact she deduced from his voice and appearance. He had a mask over the lower part of his face. He wore a dark blue cap which he never at any time removed. He wore bluejeans and a shirt and was in his sock feet. The man ordered her to remove her pajamas, which she did, and the man committed an act of sexual intercourse with her in bed under threat of death if she resisted. After her as-

sailant had completed this rape he ordered her to precede him, she being completely nude, through other rooms in the house in search of money and valuables. She testified that in one bedroom from the contents of a dresser drawer which he removed he took two manicure sets, so-called, which are two small silver knives having a cutting blade, a finger nail file, fingernail clippers, etc. One of these had imprinted on its side 'Gibbons Transport Company,' the name of one of her husband's businesses. This was one of several her husband had had made up as souvenirs to be distributed to his customers, and this one he had given to her. Another similar one bore a similar imprint of an oil company, another of her husband's businesses, which had been given to him by a representative of a company with which her husband did business. Three silver dollars belonging to the daughter and which had been given to her as presents from time to time were also taken. While rifling some of the dressers or other articles of furniture in one of the rooms the assailant found some blank checks. She had already assured him repeatedly that she had no money in the house. He then asked her how much money she had in the bank and she replied about $500.00. He ordered her to write out a check for $300.00 to Cash, which she undertook to do, but in her agitated state she did not fill in the amount of the check in letters in the space provided for that purpose, inserting the amount of $300.00 only in figures. The man took this check and put it in his pocket. Seeing that she had on a white gold wedding ring set with small diamonds all around, he forced her to give that to him.

"While her attacker was marching her through the house at the point of a knife he forced her to lie down on the dining room floor and a second time committed a rape. At one point in these wanderings through the house, the lady testified that her assailant, while looking in a clothes closet, took therefrom a lady's jacket and put it on himself. Finally, when her assailant was going through a number of items he had removed from some article of furniture, he moved a few feet away from her, and for the first time she observed that a bed was between them, and she broke and ran from the room, down the hall and out the front door, screaming for help, and ran to the back door of her neighbors, there being just a few feet separating the two houses. She pounded on the back door and her neighbors, having already been awakened by her screams, ran to the back door and opened it, and she fell into the back door, still completely nude and in an hysterical condition. These

neighbors, a young married couple, testified in the case to these facts. She was immediately covered with a blanket and comforted by the lady in whose house she had fallen, and these neighbors immediately called the police and the family physician of the victim, who lived a short distance away.

"This doctor came immediately, and after administering some tranquilizing drugs, took the victim to his office and examined her. This doctor testified to the cut on the side of her neck and an additional small cut on one of her fingers, which she had previously testified to. The doctor testified that the vaginal examination he made disclosed an abrasion or tear which had bled. The evidence showed that the victim was not menstruating at that time. At the very first contact the victim had with her neighbors at their back door, as above stated, she stated that she had been raped twice by a young negro man. She testified that her assailant was in her home for quite a long time, which she estimated to be in excess of forty-five minutes or an hour.

"The accused in this case was arrested by the police shortly after midnight of the day on which this rape occurred. He was asleep in the house and bed of a negro girl friend with whom it was shown that he lived at times. In the watch pocket of the pants he was wear-

ing in bed was found the diamond wedding ring of the victim, which she identified in open court and which was further identified by her husband. Also in the room were found the two manicure sets above described and a silver desk cigaret lighter which the victim also testified was another item that he had taken and put in his pocket while in her house. Two silver dollars were also found in his clothing. Later on the police went to the home of the accused's mother, where he was supposed to live. In the room in which he stayed there, they found a pair of bluejeans, the bottoms of the legs of which were damp, a pair of shoes which were wet and covered with mud, and an old blue cap. These articles of clothing were identified by the defendant's mother, who testified for the State, as belonging to the defendant and being the ones he had worn the preceding evening. The evidence showed that on the night this rape occurred there was considerable dampness. All of the evidence recited above was placed before the jury before the defendant's oral confession (set forth in the per curiam to Bill of Exception No. 6 and further referred to in the per curia to Bills Nos. 7 and 8) was introduced in evidence.

"A few days after this rape Mr. D. C. Scarborough, III., a neighbor of the

victim several houses removed, was working on his lawn and picked up a piece of paper which he found to be a $300.00 check signed by the victim. After consultation with his wife, they put this check in an envelope and sent it through the mail to the victim. Both Mr. and Mrs. Scarborough testified to these facts in the case, and this check was presented in evidence and identified by the victim as being the check which her assailant had compelled her to write and give to him on the night of the crime.

"When the police arrived at the scene of the crime a few minutes after the alarm was given, they found that a back door of the victim's home opening out onto a patio was propped open with a flower pot, which was shown by the evidence to be customarily located nearby.

"The defendant's oral confession introduced in evidence and set forth in the per curiam to Bill of Exception No. 6 and referred to in per curia to Bills Nos. 7 and 8, confirms in every essential respect the testimony of the victim in this case and the evidence heretofore enumerated.

"There can be no question but that the jury's verdict was abundantly and overwhelmingly supported by the law and the evidence in this case."

For the reasons assigned, the conviction and sentence are affirmed.