**MGN PENSION TRUSTEES, et al., Plaintiffs,**

v.

**MORGAN STANLEY TRUST CO., Defendants.**

**No. 95 CV 4307.**

United States District Court, E.D. New York.

Nov. 27, 1996.

Leslie Alan Lupert, Orans Elsen & Lupert, New York City, for plaintiffs.

Kenneth Caruso, Shaw, Pittman, Potts & Trowbridge, James W.B. Benkard, Davis Polk & Wardwell, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### SUMMARY

This case arises out of financial transactions set in motion by the late English media magnate, Robert Maxwell ("Maxwell"). Before the Court is the motion of defendant Morgan Stanley Trust Co. ("MSTC" or "Morgan Stanley") to dismiss the case on the grounds of *forum non conveniens.* For the reasons set forth below, the defendant's motion should be granted.

### BACKGROUND

Plaintiffs are the trustees of five pension funds which were established to provide pensions for approximately 17,000 retired employees and their families of companies owned or operated by Maxwell (hereinafter referred to as "the Pension Funds" or the "Funds").[1] The Funds were contributory plans, meaning that the employees were required to invest their own monies in them. MSTC is a New York corporation which served as global custodian for the Pension Funds' assets. From 1987 through 1992,

---

1. The trustee plaintiffs are MGN Pension Trustees, Ltd., as trustee of the Mirror Group Pension Scheme; the Law Debenture Trust Corporation plc, as trustee of the Maxwell Communication Pension Plan; Clay & Partners Pension Trustees, Ltd., as trustee of the AGB Pension Scheme and the Headington Pension Plan, and; MCP Pension Trustees, Ltd., as trustee of the Maxwell Communication Works Pension Scheme.

MSTC was based in Jersey City, New Jersey, and from 1992 to the present it has been based in Brooklyn, New York. Jurisdiction is predicated upon diversity of citizenship.

Maxwell owned approximately four hundred private companies and controlled two public corporations. After his death at sea on November 5, 1991, the plaintiffs were installed as trustees of the Pension Funds, replacing the previous trustees. The essence of their complaint is that during the months before Maxwell's death, MSTC transferred large amounts of securities owned by the Pension Funds to various banks for the benefit of Maxwell, or entities he controlled, to the detriment of the Pension Funds. The complaint also charges that MSTC allowed $100 million worth of the Pension Funds' securities to be sold without receiving or conserving the cash proceeds for the Funds' benefit.

### FACTS

#### The LBI–MSTC Contract

In or about June 1988, MSTC entered into a contract with London and Bishopsgate International Investment Management, plc ("LBI") pursuant to which MSTC agreed to take custody of securities beneficially owned by the Pension Funds worth approximately $116 million (the "Custody Agreement"). Compl. ¶ 19.[2] LBI had been retained by a company called Bishopsgate Investment Management Limited ("BIM") to render investment advice concerning these pension fund assets, which BIM was holding for the Pension Funds. *Id.* Morgan Stanley promptly sold the securities as it was directed to do by LBI and a substitute portfolio of securities was "acquired and held in custody by Morgan Stanley."[3] Compl. ¶¶ 19–20. A direct computer link was set up between LBI in London and MSTC's office in New Jersey to facilitate communication concerning transactions involving the portfolio. Compl. ¶ 21.

Among other terms, the Custody Agreement provided that MSTC was to exercise reasonable care in the performance of its duties and was to make payments from the LBI portfolio only upon written instructions from LBI which specified the purpose for which the payment was to be made. Compl. ¶ 22. Paragraph nine of the Custody Agreement reads as follows:

9. Eligible Securities held for the Customer's [LBI's] account will be transferred, exchanged or delivered by the Custodian [MSTC] or a Subcustodian, except as provided in section 10 hereof, only

(a) upon sale of such Eligible Securities for the account of the Customer and then only upon receipt of payment therefor;

(b) upon exercise of conversion, subscription, purchase or other similar rights represented by such Eligible Securities;

(c) in the case of warrants, rights or similar securities, upon the surrender thereof in the exercise of such warrants, rights or similar securities;

(d) for delivery in connection with any loans of securities made by the Customer, but only against receipt of any adequate collateral as agreed upon from time to time by the Custodian and the Customer;

(e) upon the termination of this Custody Agreement as hereinafter set forth; and

(f) for any other purpose upon receipt of explicit instructions of the Customer accompanied by evidence reasonably acceptable to the Custodian as to the authorization of such transfer, exchange or delivery.

Comp. ¶ 22(c).

Paragraph 13 of the contract refers to potential liability to LBI or "to any other person," recognizing, the complaint alleges, Morgan Stanley's contractual duty to the Funds, among others. Compl. ¶ 29. The

---

**2.** All citations to the complaint refer to the Amended Complaint filed on August 14, 1995. This allegation is ambiguous as to whether BIM or LBI was in fact holding the securities and is silent as to whether the delegation to LBI of BIM's fiduciary obligations as agent of the Funds was with the knowledge or consent of the Funds.

**3.** This allegation is ambiguous as to whether the substituted securities were "acquired"—meaning purchased in the exercise of its own judgment—or "acquired"—meaning took and held in custody.

final paragraph of the Custody Agreement provided that it would be "governed by the laws of the State of New York." Affidavit of Lista Makimson Cannon, dated December 15, 1995, (hereinafter "Cannon Aff. I"), Ex. B. According to the complaint, MSTC knew that the Pension Funds were third-party beneficiaries of its Custody Agreement with LBI. Compl. ¶ 28.

*The MGPT and AGB Securities*

The first assertion of improper conduct alleged by plaintiffs concerns securities beneficially owned by plaintiffs Mirror Group Pension Scheme and AGB Pension Scheme. On or about October 1, 1991, securities owned by the Mirror Group Pension Scheme in 102 companies were delivered to MSTC and held in an account in the name of MGPT ("the MGPT Securities"). Comp. ¶ 39. At the same time, securities owned by the AGB Pension Scheme in 60 companies were delivered to MSTC and held in an account in the name of AGBT ("the AGB Securities"). Compl. ¶ 40. MSTC opened accounts for both sets of these securities with Midland Bank as sub-custodian. Compl. ¶ 41. According to the complaint, MSTC transferred the MGPT and the AGB securities to Swiss Volksbank as collateral for a loan that Swiss Volksbank made to Robert Maxwell Group plc ("Robert Maxwell Group"), a company operated by Maxwell, in disregard of the fact that these shares belonged to two of the Pension Funds. Compl. ¶¶ 43.

After the Swiss Volksbank loan was repaid, MSTC made a similar transfer. Between October 23, 1991 and November 26, 1991, it caused 89 of the MGPT securities, worth approximately $21.5 million, and the AGB securities, worth approximately $8.7 million, to be used as collateral for the benefit of Credit Suisse, another bank which had agreed, if adequate stock were delivered, to release cash collateral it was holding in connection with a loan it had made to Robert Maxwell Group. Compl. ¶¶ 45, 52, 57. MSTC allowed the securities belonging to these two funds to be so used without notifying the Funds' trustees and without receiving adequate consideration or collateral for the Funds which owned the shares. Compl. ¶ 49. Following Maxwell's death, Credit Suisse sold the 89 MGPT securities and the AGB securities and retained the proceeds of sale to reduce the debt owed to it by Robert Maxwell Group. Compl. ¶ 53.

*The April 1991 Canadian Share Transactions*

Plaintiffs next allege improprieties by MSTC with regard to shares of Canadian corporations owned by the Funds and held in MSTC's custody ("the Canadian shares"). On or about February 2, 1991, Morgan Stanley International ("MSI"), an English affiliate of MSTC, entered into a loan agreement with a Maxwell-controlled company called London and Bishopsgate Group ("LBG"). See Compl. ¶¶ 59–61. The collateral for this loan included the Canadian shares, notwithstanding the fact that LBG did not own those shares. Compl. ¶ 61. Despite the fact that this transaction was for the benefit of LBG, and not the Pension Funds, MSTC permitted the shares to be used as collateral without receiving substitute collateral or adequate consideration in exchange. *Id.*

Although the LBG loan was eventually repaid, on or about April 8, 1991, certain of the Canadian shares which were being held by an affiliate of MSTC were transferred to a third party which had agreed to purchase them from Bishopsgate Investment Trust, Ltd. ("BIT"), another Maxwell-controlled company. This third party paid BIT for the shares even though they were part of the portfolio that MSTC was holding for the Pension Funds. Compl. ¶ 63. The same day, MSTC transferred other Canadian shares to Credit Suisse as collateral to secure loans to Robert Maxwell Group and did not receive adequate payment or collateral for the Pension Funds in exchange. Compl. ¶ 64.

Neither the Canadian shares, nor the proceeds from their sale, were ever delivered to LBI for the benefit of the Pension Funds. Compl. ¶ 65.

*The Liquidations of LBI's Assets*

The complaint further alleges that, between June 1991 and September 1991, at the request of Maxwell, his son Kevin, and others, MSTC participated in the wholesale liquidation of LBI's $100 million portfolio of

Pension Fund stocks. The first stage of the liquidation occurred in or about July, 1991 when Maxwell or someone on his behalf instructed MSTC to deliver shares beneficially owned by the Pension Funds to a third party. This third party sold the shares and transferred the proceeds to Robert Maxwell Group even though it did not own the shares or have any right to the proceeds. Compl. ¶¶ 68–69. Then, between July 24, 1991 and July 27, 1991, other securities belonging to the Funds were sold, and, pursuant to instructions given by BIT, $61 million of the sales proceeds were transferred by MSTC to the National Westminster Bank account of Robert Maxwell Group. Compl. ¶¶ 70–71. Next, on or about August 8, 1991, $23.7 million worth of shares in a company called First Tokyo Investment Trust plc were sold by MSTC. The proceeds of the sale of these assets, which were beneficially owned by the Funds, were distributed by MSTC to Maxwell-controlled entities which had no right to them. Compl. ¶ 72.

The proceeds of similar liquidations of LBI assets which occurred through August and into September 1991 were also transferred by MSTC to Maxwell-controlled companies. Compl. ¶¶ 74–75. The Pension Funds received none of the proceeds of these liquidations. Compl. ¶¶ 66–67, 76.

The amended complaint in this action was filed on August 15, 1995. On the theory that they are third-party beneficiaries of the Custody Agreement between LBI and MSTC, and/or disclosed or partially disclosed principals to that contract, the Funds' charge MSTC with (1) breach of contract; (2) breach of fiduciary duty; (3) aiding and abetting LBI's breach of fiduciary duty; (4) participating in LBI's breach of fiduciary duty; (5) fraud; and (6) aiding and abetting the fraud committed by the Maxwells, LBI and others. The plaintiffs each seek to recover their proportionate share of losses in a Common Investment Fund, of which BIM is the trustee, plus punitive damages.[4]

In its motion, MSTC contends that it would be more convenient to try this case in England. In opposition, the Pension Funds argue that this is the more appropriate court and that an English court would be unsatisfactory. By agreement, the parties have conducted discovery limited to the issues presented by this motion. Each side has extensively briefed the issues and submitted voluminous supporting documentation.

### DISCUSSION

In an early and seminal article on *forum non conveniens* the author defined the doctrine as dealing "with the discretionary power of a court to decline to exercise a possessed jurisdiction whenever it appears that the cause before it may be more appropriately tried elsewhere." Blair, *The Doctrine of Forum Non Conveniens in Anglo–American Law*, 29 Col.L.Rev. 1 (1929). That definition, I would submit, goes directly to the essence of the doctrine, if the phrase "more appropriately tried elsewhere" is understood to mean that "[t]he ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947). Justice Brandeis acknowledged that "Courts ... occasionally decline, in the interest of justice, to exercise jurisdiction, where the suit is between aliens or non-residents, or where for kindred reasons the litigation can more appropriately be conducted in a foreign tribunal." *Canada Malting Co., Ltd. v. Paterson Steamships, Ltd.*, 285 U.S. 413, 423, 52 S.Ct. 413, 416, 76 L.Ed. 837 (1932). The essence of the doctrine so elegantly and succinctly stated by Blair provides the skeleton to which flesh has been added by just two cases which warrant extended discussion, namely, *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and *Piper Aircraft Company v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). A discussion of the vast number of cases which have considered the doctrine, many of which have been cited in the excellent and extensive submissions by the parties, would be an affectation of research. A cursory resort to

---

4. MGN Pension Trustees, Ltd. and Clay & Partners Pension Trustees, Ltd. also seek to recover losses incurred to funds beneficially owned by them, but held independently of the Common Investment Fund.

Shepard's Citations revealed that approximately 1600 cases have cited *Gilbert* and that approximately 1,000 cases have cited *Piper Aircraft*. It is thus fair to say, that the law of *forum non conveniens* is revealed in *Gilbert* and *Piper Aircraft* and the rest is commentary.

In *Gilbert* the plaintiff, a resident of Lynchburg, Virginia, sued Gulf, a Pennsylvania corporation qualified to do business in Virginia and New York, in the United States District Court for the Southern District of New York. The complaint alleged that Gulf, in violation of Lynchburg ordinances, carelessly delivered gasoline to the plaintiff's warehouse tanks and pumps causing an explosion and fire which destroyed the warehouse and the property stored in it. Gulf invoked the doctrine of *forum non conveniens*. The question before the Court was whether the district court had inherent power to dismiss the action pursuant to the doctrine and if it did, was the power abused. The jurisdiction of the court and venue were not in issue. Gulf's invocation of the doctrine succeeded in moving the court to dismiss the complaint and returning the plaintiff to the courts in Lynchburg. The Court's statement of the doctrine was expansive but not instructive in informing the judgment of a nisi prius judge regarding the appropriate invocation of the doctrine, viz: "The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." 330 U.S. at 507, 67 S.Ct. at 842. The touchstones providing guidance to the appropriate invocation of the doctrine were subsequently suggested in that portion of the opinion for which *Gilbert* has been extensively cited, as follows:

An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

Factors of public interest also have a place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

Approximately thirty-five years later, the Court decided *Piper Aircraft Company v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), a case that arose out of an air crash in Scotland. The representatives of the estates of several Scottish citizens killed in the accident commenced wrongful death actions ultimately coming to rest before a United States District Court in Pennsylvania. The defendants in those actions were Piper, the Pennsylvania manufacturer of the aircraft and Hartzell Propeller, Inc. ("Hartzell"), the Ohio manufacturer of the propellers, who were sought to be held liable on theories of negligence and strict liability. Hartzell and Piper moved to dismiss the complaint against them on the ground of *forum non conveniens*. The plaintiff opposed that motion primarily on the ground that Scottish law was less favorable than the law of the chosen forum. The Dis-

trict Court, assessing the *Gilbert* factors, granted the motion. The United States Court of Appeals for the Third Circuit reversed and remanded for trial basing its decision on the ground that the District Court abused its discretion in applying the *Gilbert* analysis and, alternatively, that dismissal on the ground of *forum non conveniens* is never appropriate where the law of the alternative forum is less favorable to the plaintiff. The Court of Appeals was held to be in error in both respects.

Justice Marshall's opinion fully addresses the concerns which test the reach of the doctrine and in the process drives this court to the conclusion at which it arrives in this case.

## I. *THE ALTERNATIVE FORUM*

 One of the concerns which has occupied the parties and to which each has devoted considerable efforts of advocacy and learning is whether the law of England, the alternative forum, is less hospitable to the plaintiffs than is the law of their chosen forum. That basis for the Circuit Court's rejection of the defendant's invocation of the doctrine of *forum non conveniens* in *Gilbert* had been explicitly rejected by the Supreme Court even years before *Gilbert* in *Canada Malting Co., supra,* where, in opposing a motion to dismiss, the plaintiff argued that because the laws of the alternative forum were less favorable to them, the motion should be denied. Recognizing that *Canada Malting* was decided before the doctrine of *forum non conveniens* was judicially formed by *Gilbert,* the Court declared that the validity of *Canada Malting* was reaffirmed by *Gilbert's* implicit recognition that "dismissal may not be barred solely because of the possibility of an unfavorable change in law." 454 U.S. at 249, 102 S.Ct. at 262. The Court elaborated upon and emphasized that view at various points in its opinion so as to leave no doubt as to its efficacy. For example: "[I]f conclusive or substantial weight were given to the possibility of a change in law, the forum non conveniens doctrine would become virtually useless"; "[E]very Federal Court of Appeals that has considered this question after *Gilbert* has held that dismissal on

grounds of forum non conveniens may be granted even though the law applicable in the alternative forum is less favorable to the plaintiff's chance of recovery." (citations omitted) 454 U.S. at 250, 102 S.Ct. at 263. The Court also noted that to uphold the view that a less favorable law in the alternative forum precludes dismissal "would result in other practical problems. At least where the foreign plaintiff named an American manufacturer as defendant, a court could not dismiss the case on grounds of forum non conveniens where dismissal might lead to an unfavorable change in law. The American courts, which are already extremely attractive to foreign plaintiffs, would become even more attractive. The flow of litigation into the United States would increase and further congest already crowded courts." (Footnotes omitted). 454 U.S. at 251–52, 102 S.Ct. at 263–64.

In adverting above to the considerable efforts expended by the parties on the propriety of England as an alternative forum, it should have been explained, perhaps, that those efforts were directed at whether the third party beneficiary principle of the law of contracts would be recognized by an English court and whether, as regards the tort claims, the *lex loci delicti,* or the law of the place "which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." *See Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *Restatement, Second, Conflict of Laws* § 145. The propriety of evincing concern with choice of law principles is clearly reflected in *Canada Malting, supra,* a suit in admiralty arising from the collision of two vessels in Lake Superior, on the American side of the international boundary line. A motion to dismiss on the ground that the parties were Canadian citizens and that the controversy concerned matters more properly determined by the Canadian courts was granted by the District Court and affirmed by the Court of Appeals for the Second Circuit. In the Supreme Court, the respondent contended that the doctrine of *lex loci delicti* was not applicable. Justice Brandeis, writing for the Court, noted that "[w]e have no occasion to enquire by what law the

rights of the parties are governed, as we are of the opinion that, under any view of the question, it lay within the discretion of the District Court to decline to assume jurisdiction over the controversy.... '[T]he court will not take cognizance of the case if justice would be as well done by remitting the parties to their home forum.'" 285 U.S. at 419–20, 52 S.Ct. at 414–15. *Piper Aircraft* quoted that observation with approval, 454 U.S. at 247–48, 102 S.Ct. at 261–62. More explicitly, however, *Piper Aircraft* can be read as teaching that the efforts of the parties in this case directed towards a choice of law analysis were misspent.

In its disapproval of the Circuit Court's decision that a less favorable law in the alternative forum counsels against applying the doctrine of *forum non conveniens*, the Court wrote:

> If the possibility of a change in law were given substantial weight, deciding motions to dismiss on the ground of forum non conveniens would become quite difficult. Choice-of-law analysis would become extremely important, and the courts would frequently be required to interpret the law of foreign jurisdictions. First, the trial court would have to determine what law would apply if the case were tried in the chosen forum, and what law would apply if the case were tried in the alternative forum. It would then have to compare the rights, remedies, and procedures available under the law that would be applied in each forum. Dismissal would be appropriate only if the court concluded that the law applied by the alternative forum is as favorable to the plaintiff as that of the chosen forum. *The doctrine of forum non conveniens, however, is designed in part to help courts avoid conducting complex exercises in comparative law.* As we stated in Gilbert, the public interest factors point towards dismissal where the court would be required to "untangle problems in conflict of laws and in law foreign to itself." 330 U.S. at 509, 67 S.Ct. at 843 (emphasis added).

454 U.S. at 251, 102 S.Ct. at 263.

▬ If, however, I read more into *Piper Aircraft* than is warranted in this regard and

should engage in a complex exercise in comparative law, I would find the plaintiffs' choice of law positions unpersuasive. First, as concerns their view (disputed by the defendant's expert) that the law of England would not recognize their rights as third party beneficiaries to a contract, the contract in issue expressly provides that it shall be governed by the laws of the State of New York. There is no suggestion that an English court would not give effect to that intention of the parties nor is there any doubt about the continuing viability in New York of *Lawrence v. Fox,* 20 N.Y. 268 (1859), in which the third party beneficiary doctrine was first announced more than one hundred years ago. The assertion, if it were made, that an understanding of that doctrine would be beyond the ken of an English judge would be summarily rejected. " '[T]he courts of this country' should not 'disparage the authority or competence of international forums for dispute resolution.'" *International Minerals and Resources v. Pappas,* 96 F.3d 586, 592 (2nd Cir.1996), quoting from *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* — U.S. ——, ——, 115 S.Ct. 2322, 2328, 132 L.Ed.2d 462 (1995).

As to the claims sounding in tort, whether the law to be applied is the *lex loci delicti* or the law of the jurisdiction having the most significant relationships with the occurrence and the parties, the facts would compel the conclusion that that law would be the law of England.

In the determination of this motion to dismiss on the ground of *forum non conveniens,* the court is obliged to assess the private and public interest factors *Gilbert* deemed to be relevant for that purpose.

## II. THE PRIVATE AND PUBLIC INTEREST

The specific factors in these categories regarded by *Gilbert* as having a bearing on the determination of this motion, in sum, provide the answer to the essential inquiry—could this case be more appropriately tried elsewhere because to do so would best serve the convenience of the parties and the interests of justice? Prefatory to a discussion of these factors is the importance of keeping in sharp

focus the fact that this litigation was spawned by a contract—the Custody Agreement—between MSTC, then situated in Jersey City, New Jersey and LBI of London, England, ("Cannon Aff. I, Ex. B.).

## A. THE PRIVATE INTERESTS

■ The chronology of events leading to the contract at the heart of this action has been broadly outlined at the outset. Even a cursory review of that outline reveals that the crucial events and the actors in them were the trustees of the Pension Funds, the appointment by the trustees of BIM and the parties to that transaction; the appointment of LBI by BIM and the parties to that transaction; the parties to the contract, namely, LBI and Morgan Stanley, and finally, the officers of Swiss Volksbank and Credit Suisse.

The complaint states that all the plaintiffs are English. The directors of MGPT, which was a trustee of one of the Funds during the relevant period, each of whom had an involvement with the LBI account, reside in England. (Plaintiffs' Memorandum of Law, Ex. A) ("Pl.Mem."). The officers, employees, lawyers and accountants of MGPT, upon information and belief, are all to be found in England. Cannon Aff. I, ¶ 6.

The Law Debenture Trust Corporation plc ("LDT") is the successor to Maxwell Communication Pension Trustee Limited ("MCPT") which was the trustee at all times relevant to this proceeding. The officers, directors, employees, lawyers and accountants of MCPT are, upon information and belief, all to be found in England. Cannon Aff. I, ¶ 8.

The 17,000 retired employees for whom succor in their old age the pensions were designed to provide are, for the most part, to be found in England.

BIM is an English company and, upon information and belief, was authorized to do business pursuant to the U.K. Financial Services Act of 1986. In accordance with that Act, BIM was regulated by the Investment Management Regulatory Organization ("IMRO"), an English organization which regulates investment businesses, including pension fund managers. BIM's directors included two sons of Robert Maxwell, Ian and Kevin, Trevor Cook and from September, 1991, Larry Trachtenberg. BIM is currently in liquidation and its liquidators are members of Robson Rhodes, London accountants and their solicitors are Stephenson Harwood, a London law firm.

LBI was an English company authorized to do business under the U.K. Financial Services Act and pursuant to that Act, regulated by IMRO. Its directors included Robert Maxwell and his sons, Ian and Kevin, and Larry Trachtenberg. Trachtenberg executed the custody agreement on behalf of LBI with Morgan Stanley and he resides in London. Residing in London too, are Stuart Carson, LBI Compliance Officer; Mark Tapley, LBI Managing Director, and Gary Ponsford, LBI Accounts Administrator. (Ex. A, Pls. Mem.; Cannon Aff. I, ¶ 16).

The signatory to the Custody Agreement on behalf of Morgan Stanley, Robert Kay, resides in London. (Ex. A, Pls.Mem.). Exhibit A, attached to the plaintiffs' memorandum of law in opposition to the motion lists thirty-four persons believed to have familiarity with the events material to this application. It lists fifteen in the United Kingdom and one in another country. Among the sixteen are vice-presidents of Swiss Volksbank and two employees of Credit Suisse, banks alleged to be implicated in the wrongdoing of which the defendant is accused.

There is no dispute that Morgan Stanley never entered into any contract with any plaintiff, nor does it appear that LBI ever entered into any agreement with the Pension Funds. The London office of Morgan Stanley handled the customer relationship with LBI, but its computer and support services were handled from its offices in Jersey City, New Jersey. The defendant contends that the persons who were responsible for managing the account, i.e., the business contemplated by the contract between it and LBI and who are therefore necessary witnesses, are in London. Cannon Aff. I ¶ 21. Thirty-four persons are listed by the plaintiffs as relevant fact witnesses but notably not as *necessary* witnesses. Morgan Stanley's motion for dismissal is grounded in part upon its assertion that necessary and crucial witnesses are

beyond the reach of compulsory process. Those witnesses are the Pension Fund trustees, the directors, officers and employees of BIM and LBI and the officers of Swiss Volksbank and Credit Suisse, among others. I am convinced that Morgan Stanley has provided sufficient information to decisively tip the balance in its favor as regards this prong of the private interest factor. *See Piper Aircraft*, 454 U.S. at 258–59, 102 S.Ct. at 267–68.

The defendant's motion to dismiss is bottomed additionally upon its assertion that the plaintiffs have not joined necessary parties, pursuant to Rule 19, Fed.R.Civ.P. Rule 19 aside, "the problems posed by the inability to implead potential third-party defendants clearly support[ ] holding the trial" in England. Joinder of or the ability to implead BIM and LBI "is crucial in the presentation of" Morgan Stanley's defense. *Piper Aircraft*, 454 U.S. at 259, 102 S.Ct. at 267. The contractual obligation of Morgan Stanley to obey the instructions of LBI (see ¶ 8 of Custody Agreement annexed as Ex. B to Cannon Aff. I) may affect the determination of its liability, if any, a defense which makes essential the availability of LBI. The presence of LBI as a party to this litigation is also crucial given the claim that the defendant aided and abetted LBI in the commission of its breach of fiduciary duty and fraud. It is superfluous to cite authority for the elementary principle that one cannot aid and abet the commission of a wrong unless a wrong was committed by someone to begin with. A finding that Morgan Stanley is an aider and abetter would necessarily be a finding that LBI was a wrongdoer, a finding which would materially affect the plaintiffs' claim and materially affect Morgan Stanley's pursuit of indemnity. A review of the facts as outlined above implicates fundamental questions in the law of Agency which inhere in a defense that may be raised by Morgan Stanley. The maxim *delegatus non protest delegare* bespeaks a hoary principle in the law of Agency—delegated authority cannot be delegated. Did BIM have authority to delegate to LBI? Did LBI, in turn, have the authority to delegate to Morgan Stanley? Is LBI the agent of BIM or is it the agent of the Pension Funds? To whom is LBI responsible for its misfea-

sance or nonfeasance, if any, upon which Morgan Stanley's aider and abetter liability must be predicated? To ask these questions is to answer the question as to the necessity of BIM and LBI to be available to be impleaded by Morgan Stanley. Their unavailability to Morgan Stanley in this forum would preclude the resolution of all claims in one trial and even if that finding would make the trial in the forum only burdensome, that would be "sufficient to support dismissal on grounds of forum non conveniens." *Piper Aircraft*, 454 U.S. at 259, 102 S.Ct. at 267.

The court is cognizant that there is ordinarily a strong presumption in favor of the plaintiffs' choice of forum. That presumption, however, "applies with less force when the plaintiff or real parties in interest are foreign.... [A] plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum. When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." 454 U.S. at 255–56, 102 S.Ct. at 265–66. (Citations omitted). "Lower federal courts have routinely given less weight to a foreign plaintiff's choice of forum." 454 U.S. at 256, n. 23, 102 S.Ct. at 266, n. 23 (If the trial in the chosen forum would be inconvenient for the defendant dismissal is proper and "citizenship and residence are proxies for convenience").

## B. *THE PUBLIC INTERESTS*

■ The public interest factors *Gilbert* recited as having a place in applying the doctrine of *forum non conveniens* have been set out above. An attempt to assay the burden that would be imposed upon the citizenry of this district which has virtually no relation to this litigation were it to remain here, would be purely speculative and not productive. I would with some confidence, however, venture to say that the administrative difficulty for this court, accustomed as it is to handling complex litigation, would be negligible. This is a case which touches the affairs of approxi-

mately 17,000 retirees, most of whom are in England and "there is reason for holding the trial in their view and reach rather than in remote parts of the [world] where they can learn of it by report only. There is a local interest in having localized controversies decided at home." *Gilbert*, 330 U.S. at 509, 67 S.Ct. at 843. The significance of this factor is one that bears exceptional weight in this case. The unraveling of the tangled web of the Maxwell enterprises from which the pension trusts are derived, engaged the attention of the Serious Fraud Office, the Department of Trade and Commerce and the House of Commons in the United Kingdom. The disintegration of the Maxwell empire has also prompted a cry for regulatory reform by the House of Commons and by the Securities and Investment Board. (Cannon Aff. I, ¶ 2). Of seventeen proceedings which the collapse of that empire has spawned, thirteen were commenced in London, three in New York, and one in France. Cannon Aff. I, Ex. F.

It is difficult to discern any justifiable bases for selecting this forum. The only meaningful connection with this forum that is apparent is that Morgan Stanley's headquarters is located in Brooklyn, but it also has an office in London and has consented to the jurisdiction of the English courts, which the court understands to include a consent to make available as witnesses persons in its employ. *See Piper Aircraft*, 454 U.S. at 254, n. 22, 102 S.Ct. at 264, n. 22 ("At the outset of any forum non conveniens inquiry the court must determine whether there exists an alternative forum. Ordinarily this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction.")

For approximately five years, 1987–1992, which embraces the period relevant to this case, the defendant was based in New Jersey. Since 1992, the defendant has been based in Brooklyn. The plaintiffs loudly trumpet the great interest the State of New Jersey has in this case because the defendant was regulated by the New Jersey Department of Banking when it was based there four years ago. If that were a meaningful factor, it would seem that venue should have been laid in New Jersey. There is no indica-

tion that the New Jersey Department of Banking has evinced any interest in this case by way of any inquiry or proceeding commenced against the defendant. It is interesting to note that one reason for the plaintiffs' assertion that New York is a proper forum is that the defendant is currently regulated by the Banking Department of the State of New York although there is no suggestion that the New York Banking Department has any interest or involvement whatsoever in this case. In this regard it is of more than passing interest to note the following provision in paragraph 3 of the Custody Agreement:

The Custodian, [the defendant] and any Subcustodian to be appointed by the Custodian will each fulfil one of the following conditions:

(a) *it will be an approved bank for any purpose within the meaning of regulation 1.3 of the Financial Services (Clients' Money) Regulations 1987 of the United Kingdom* (the "Regulations"); or

(b) it will be a body corporate whose business consists solely in acting as a nominee holder of investments and it, or its directors, will be accustomed to act in accordance with the Custodian's directions or instructions of, those of another authorized person or of an approved bank as aforesaid (*in this subparagraph "investments" and "authorized persons" have the meanings ascribed to them in sections 1(i) and 7(i), respectively, of the Financial Services Act 1986 of the United Kingdom (the "Act")* ); or

(c)(i) its normal business will include the provision of investment custodial services; and

(ii) in providing those services it will be subject to regulation and supervision by a *regulatory body or agency of government in the country in which it will perform such sub-custodial services,* or to independent review (not less frequently than annually) by auditors with qualifications prescribed by law or prescribed by such body or agency. (Emphasis added).

In the light of the foregoing, the insistence upon the applicability of the law of New

Jersey and the interest of the State of New Jersey in this proceeding is puzzling.

That this is an English case about English assets held in trust by English trustees for the benefit of approximately 17,000 prospective pensioners, almost all of whom are English, would seem to be subliminally acknowledged by the complaint in that every paragraph of that document in which a money reference is made in dollars, the British equivalent in pounds is given. For example, in paragraph 20, the value of securities of which Morgan Stanley took custody is stated to be "approximately $116.8 million (approximately £ 68.3 million."). See also paragraphs 57, 59, 66, 71, 72, 74. A reading of the complaint in its entirety can lead only to the conclusion that it is instinct with the redolence of an English forum. As has been previously noted, the facts as they have been found to be can leave no doubt that England is the jurisdiction having the most significant relationships with the events and the parties who were actors in them.

Having carefully considered the facts and the inferences to be drawn from them as well as the public and private interest factors and the availability of an alternative forum, I conclude that "justice would be best served by leaving the parties to this suit in England." *See Charter Shipping Co. v. Bowring,* 281 U.S. 515, 518, 50 S.Ct. 400, 401, 74 L.Ed. 1008 (1929).

The temptation to divine the motivation of the parties in insisting upon one forum rather than another is enticing and that divination is surely not difficult. "There comes a point where [the] Court should not be ignorant as judges what we know as men." *Watts v. Indiana,* 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949). Justice Marshall was not ignorant of the fact that each party was motivated by a desire to obtain a more favorable forum. *Piper Aircraft,* 454 U.S. at 252, n. 19, 102 S.Ct. at 264, n. 19. *See also* Blair, *The Doctrine of Forum Non Conveniens in Anglo–American Law,* 29 Columbia L.Rev. 1, 34 (1929). Regardless of that motivation, however, the motion to dismiss should be granted if the defendant has convincingly rebutted the presumption in favor of the plaintiffs' choice of forum. I have concluded that the defendant has done so and its motion must be granted.

SO ORDERED.